**MOHAWK AIRLINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent,**

and

**Allegheny Airlines, Inc., Intervenor.**

**No. 591, Docket 32933.**

United States Court of Appeals
Second Circuit.

Argued May 16, 1969.

Decided June 5, 1969.

Raymond J. Rasenberger, Zuchert, Scoutt & Rasenberger, Washington, D. C., for petitioner.

Warren L. Sharfman, Associate General Counsel, Litigation and Research, Civil Aeronautics Board (Richard W. McLaren, Asst. Atty. Gen., and Howard E. Shapiro, Attorney, Department of Justice, Joseph B. Goldman, General Counsel, O. D. Ozment, Deputy General Counsel, Robert L. Toomey, Attorney, and James M. Upton, Attorney, Civil Aeronautics Board, on the brief), for respondent.

William L. Howard, Jr., Washington, D. C. (Edwin I. Colodny, Washington, D. C., on the brief), for intervenor.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Mohawk Airlines, Inc. (Mohawk) petitions this court to review and set aside that portion of Civil Aeronautics Board Order No. 68–9–73 which granted to Allegheny Airlines, Inc. (Allegheny) a revised certificate of public convenience and necessity authorizing it to provide nonstop service between the following three pairs of junctions: 1) Islip, New York—Cleveland, Ohio, 2) Islip, New York—Detroit, Michigan, and 3) Bridgeport, Connecticut—Detroit, Michigan.[1]

By its Order E–23856, issued on June 23, 1966, the Civil Aeronautics Board (the Board) instituted *Allegheny Airlines Route 97 Investigation*. After several preliminary proceedings, a hearing before an Examiner commenced on August 15, 1967. Nine airlines, including Allegheny and Mohawk, and other interested parties participated. On January 16, 1968, the Examiner entered his Initial Decision concluding, inter alia, that Allegheny should be granted nonstop authority in the Islip-Cleveland, Islip-Detroit and Bridgeport-Detroit markets. Mohawk then filed a timely petition with the Board seeking discretionary review of this portion of the Examiner's Initial Decision. After denying Mohawk's petition, the Board, on September 19, 1968, entered Order No. 68–9–73 formally amending Allegheny's certificate in accordance with the Examiner's recommendations. On September 27 the Board further denied Mohawk's motion for a stay of the order, and on December 9 this court also refused a stay pending review. In the proceeding now before us, Allegheny has intervened in support of the Board.

I.

Mohawk's prayer for relief is grounded on its claim that the Board did not provide it with adequate notice that nonstop authority for the three pairs of routes we have referred to would be at issue in the *Route 97 Investigation*. It further claims that it suffered substantial prejudice as a result of the lack of notice because the nonstop traffic on these routes is not large enough to support more than one airline, and therefore the award of authority to Allegheny precludes it from obtaining similar competitive operating rights in these markets.

Under the doctrine of Ashbacker Radio Corp v. F.C.C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), if an agency's award of one application for operating authority would be mutually exclusive as a matter of fact with the award of others before the agency, the competing applications must be considered contemporaneously. In accordance with this doctrine, the Board's rules allow motions for consolidation of proceedings involving competing applications in order that they may be given comparative consideration. 14 C.F.R. § 312.12. Mohawk contends its lack of notice that the *Route 97 Investigation* might result in a grant of the indicated nonstop prevented it from moving for consolidation in time so that its qualifications for such authority could be considered contemporaneously with those of Allegheny. Thus, it asserts it was deprived of its *Ashbacker* rights.[2]

II.

In order to assess Mohawk's claim, it is necessary to review the descriptions of the scope of the investigation set forth by the Board and the Examiner as the proceeding progressed. First, in its order instituting the *Route 97 Investiga-*

---

1. This court has jurisdiction by virtue of 49 U.S.C. § 1486(a) and 5 U.S.C. § 702. Venue is proper under 49 U.S.C. § 1486 (b) because Mohawk's principal place of business is in the state of New York.

2. Actually, Mohawk did not have competing applications for such authority pending

at the time the *Route 97 Investigation* was instituted. Therefore its argument is, more precisely, that had it known that these routes were in issue, it would have filed applications for operating authority and then moved for consolidation under *Ashbacker*.

*tion,* the Board listed the issues it intended the investigation to include. With regard to Allegheny, the Board recorded seven possible alterations of the certificate which it would consider. Items 1 through 5 and 7 all dealt with specifically identified individual routes or a series of routes, referred to as a "segment." None of these included the routes here in issue. Item 6 stated as one of the objectives of the investigation: "to consider the realignment of segments 1, 3, 4, 5, 6 and 7 in such manner as to permit increased flexibility in flight scheduling and greater operational efficiency and economy." [3] Segment 8, the only segment on which Islip is located, was not mentioned.

The intended scope of the investigation was further elucidated by the explanatory portion of the order, in which the Board stated:

"* * * At the present time liberalized operating authority and improved route structure for Allegheny on the *eastern* part of its system, which is primarily north-south oriented, are being considered in the pending Allegheny Airlines, Inc. Segment 8 Renewal and Route Realignment Investigation, * * * and the New York-Florida Renewal Case. * * * However, neither of these cases involves issues related to the *western* part of the carrier's system. *This is the area to which we intend to direct our attention*

*in the instant investigation."* (Emphasis added.)

The Board further stated that it wished to consider a realignment of the six enumerated Allegheny segments so as to consolidate them into a lesser number of segments "consistent with the general nature of the carrier's operations." In accompanying footnotes, the Board elaborated by stating: "Segments 2 and 8 are excluded"; and, "We do not propose by this realignment to affect Allegheny's basic authority, but rather to eliminate duplicate authority and unnecessary restrictions and conditions."

Not entirely content with this delineation of the scope of the investigation, Allegheny submitted to the Board a Petition for Reconsideration and Clarification of the order. In this petition, Allegheny requested that the Board include within the scope of the investigation its application for nonstop authority on certain specified routes not mentioned in points 1 through 5 and 7 of the Board's order. These explicitly particularized routes also did not include the three here in question. Additionally, Allegheny requested that the Board clarify its description of the route realignment issue involving segments 1, 3, 4, 5, 6 and 7 to provide that no limitations were imposed upon the manner in which these segments might be realigned or consolidated. Mohawk submitted an answer to Allegheny's

---

3. The full statement of issues involving the amendment of Allegheny's certificate was:
   "(1) to add the point Allentown Bethlehem-Eastern to such segments as would be necessary to permit single-plane service from such point to Cleveland, Detroit, Buffalo, and Boston;
   (2) to remove as much of condition 5(b) as prohibits nonstop service between Pittsburgh, on the one hand, and Buffalo, Baltimore, and Hartford-Springfield, on the other;
   (3) to revise condition 4 so as to authorize two-stop service between Detroit and New York/Newark and one-stop service between Detroit and Philadelphia-Camden; Detroit and Washington; Detroit and Baltimore; Cleveland and Philadelphia-Camden; Cleveland and Baltimore; and Cleveland and Washington;
   (4) to add Jamestown, Bradford, and/or Oil City/Franklin as intermediate points on an Allegheny segment other then segment 4;
   (5) to delete any or all of the intermediate points on segment 4 if such point or points are certified in this case for service on the system of another carrier, or on another Allegheny segment;
   (6) to consider the realignment of segments 1, 3, 4, 5, 6, and 7 in such manner as to permit increased flexibility in flight scheduling and greater operational efficiency and economy;
   (7) to include permanent flagstop authority of the same type now temporarily authorized for Allegheny by Order E–9836, effective February 10, 1956."

petition, objecting to an expansion of the scope of the proceeding beyond that outlined in the Board's original order. It called attention to the Board's statement that the investigation would focus on the "western part" of Allegheny's route system, and that the realignments proposed would not have significant competitive effects on other airlines but would merely solve Allegheny's internal problems. Anticipating the possibility that the Board might nevertheless agree to expand the scope of the investigation in accordance with Allegheny's request, Mohawk reserved the right to move for consolidation of its own applications which would be mutually exclusive with any of the route issues which the Board might add to the investigation.

Eventually, the Board issued its Order of Reconsideration and Consolidation (Order E–24905) on March 27, 1967. In this order, the Board agreed to include in the investigation Allegheny's request for nonstop authority for certain additional specified routes and denied its request as to certain other routes. The order went on to state:

"Allegheny's request for clarification of the segment realignment issues is in effect a request for the broadest possible construction of this aspect of the case. It contends that the Board has put in issue the question of realignment on a broad scale encompassing nearly every conceivable possibility including the consolidation of all five primarily east-west segments into a single segment. * * *

*"Our intention, as stated in Order E–23856* [the order instituting the investigation], *is to provide an appropriate vehicle for conforming the route description contained in the carrier's certificate to its traffic flow and its operations and to eliminate duplicate authority, unused authority, and unnecessary restrictions and conditions without expansion of Allegheny's basic authority.* While the realignment issue was framed so as to afford Allegheny flexibility in presenting proposals for realignment, to keep the pro-

ceeding within reasonable bounds, we will expect Allegheny to formulate and submit specific proposals. * * * *Of course, these proposals are to be confined to the scope of Allegheny's basic authority."* (Emphasis added.)

On April 20, 1967, a week before the prehearing conference, Allegheny, in compliance with the Board's instructions, submitted specific realignment proposals in the form of a proposed certificate. Here, for the first time, it included among the routes for which it sought nonstop authority the three now in issue: Islip—Cleveland, Islip—Detroit, and Bridgeport—Detroit. In general terms, Allegheny's proposed certificate combined with the segments placed in issue by the Board (segments 1, 3, 4, 5, 6 and 7) segments 2 and 8, which the Board's first order had explicitly excluded from the investigation.

At the prehearing conference, Allegheny's effort thus to expand the scope of the investigation again came in issue. Paragraph A(1) of the Statement of Issues framed by the Bureau of Operating Rights stated:

"Do the public convenience and necessity require the alteration, amendment or modification of Allegheny's certificate of public convenience and necessity for Route 97 * * * to the extent necessary to:

(1) Realign segments 1, 3, 4, 5, 6 and 7 and, if so, in what manner should the segments be realigned and what terms, conditions and limitations should be imposed upon such realignment?"

The report of the prehearing conference indicates United Air Lines requested that this statement of the issue be qualified to reflect the Board's intention that any realignment effected would not change Allegheny's basic authority. Several other airlines requested similar clarification. However, the Examiner, refusing further to define the scope of the investigation, stated merely that the Board's two orders were explicit on the

point and that the proceeding would be confined to the issues specified therein.

The investigation hearing then commenced on August 15, 1967. Again, the first matter raised was the propriety of Allegheny's extensive realignment proposal. Counsel for United Air Lines, objecting both generally to Allegheny's broad view of the realignment issue and specifically to its request for expanded authority in the Islip markets, argued vigorously that Allegheny's proposals exceeded the scope of the issues to be considered as delineated in the Board's orders. In so arguing, United relied especially on the Board's statements that segments 2 and 8 were not to be included in the investigation, and that the proposed realignments would not effect any change in Allegheny's basic authority. Accordingly, United requested that the Examiner clarify the scope of the issues to be considered in the investigation.

After an extended discussion in which Allegheny and several other parties participated, the Examiner stated with respect to Allegheny's proposals for nonstop authority on certain routes not involving Islip:

> "As I understand the intent of the Board's order, it did spell out in the original order of investigation, Order 23856, specific markets in which it would have considered changes from three-stop to two-stop service and from two-stop to one-stop service. *I am inclined to think that the Board in that respect was apparently taking the view unless the particular market is identified, with respect to a change from two-stop to one-stop, for example, that it was not in issue as such.*" (Emphasis added.)

With this explanation, the Examiner granted United's motion to exclude from the investigation several of the routes not specified by the Board which Allegheny had included in its proposals. The Examiner then went on to give the following ruling on the objection to the inclusion of the Islip routes:

> "As to Islip, it is rather a hybrid situation. It is true that it is not on segments which were specifically spelled out by the Board. It was on segment 8, I believe, which was excluded from consideration in this case. However, I think the Board probably would want an opportunity to consider what the effect of the realignments are here, *what the effect is of realignments insofar as it might affect Islip,* and I will not exclude Islip from consideration as far as it is involved in the proposed realignments as set out by Allegheny. To that extent, I will deny the motion. However, I want to make clear that any authority awarded to Allegheny which involves possible changes in basic authority would certainly be subject to any necessary restrictions and conditions, and I am denying the motion only because I think this is a subject which the Board should have an opportunity to consider, mainly, *what the effect of realignment would have on a point such as Islip.*" (Emphasis added.)

Mohawk did not take a position with respect to the Examiner's ruling on Allegheny's proposed realignment issues at the hearing, but reserved the right to do so in its brief. It did, however, present evidence at the hearing on the merits of Allegheny's proposals for authority to operate on these routes. And later, in its brief to the Examiner, Mohawk did take the position that an award of nonstop authority to Allegheny in the Islip—Cleveland, Islip—Detroit and Bridgeport—Detroit markets would exceed the scope of the investigation as defined by the Board. Moreover, it contended that because of the lack of notice that these routes were in issue, such an award would violate Mohawk's right to comparative consideration under the *Ashbacker* doctrine.

In his Initial Decision, filed January 29, 1968, the Examiner rejected Mohawk's notice claim, and proceeded to grant Allegheny nonstop authority in the three markets questioned. Mohawk then filed a timely Petition for Discre-

tionary Review with the Board objecting to this grant of authority to Allegheny, again claiming lack of notice that such authority had been in issue. The Board also rejected this argument, characterizing it as "only a technical one." For the reasons below, we must disagree with this conclusion of the Board.

### III.

At the outset, we would emphasize that although Mohawk's complaint is a procedural one, we cannot dismiss its argument out of hand on the ground that it has latched on to "a mere technicality," for we do not believe such characterization aids us in our determination whether the claim has merit. A party's right to know what issues of interest to him may be determined in a proceeding in which he is participating is an absolute requisite of elemental fairness. It is in this perspective that we must weigh the virtues of Mohawk's contention.

Looking first to the Board's Order E–23856 instituting the *Route 97 Investigation,* it seems apparent that this order did not provide Mohawk with adequate notice, or indeed even a hint, that the route authority here in contention would be included in the investigation. Nor does the Board seriously suggest the contrary. Indeed, from all we have set forth, this order seems to have excluded its consideration. First, it seems significant that although all the other issues relating to proposed changes in operating authority were framed in specific terms, actually designating the routes or individual route segments to be considered, issue 6, the realignment issue, was phrased in very broad terms, leaving obscure the actual changes contemplated. Thus, from the particularity with which changes in authority were enumerated in the rest of the order, Mohawk might reasonably have interpreted issue 6 as comprehending no similar grants of authority. Second, the order specifically stated that segment 2 and segment 8, the only

segment on which Islip was located, would *not* be included within the scope of the investigation. Third, the order stated that the investigation was to be concerned only with the *western* part of Allegheny's route system while both Islip and Bridgeport are on the eastern portion of that system. And lastly, the Board explained that the purpose of the realignment was "to eliminate duplicate authority and unnecessary restrictions and conditions," *without* affecting Allegheny's "basic authority." Thus, the Board gave strong initial indication that it did not intend to include consideration of the Bridgeport and Islip routes within this investigation. The only question remaining is whether subsequent events provided Mohawk with notice that the Board intended to enlarge the scope of the investigation so as to include these routes.

Surely, the next stage of the proceeding did not provide such notice. Allegheny's Petition for Reconsideration and Clarification, requesting consideration of nonstop authority in certain specific markets not mentioned in issues 1 through 5 and 7 of the Board's original order did not include mention of the Bridgeport and Islip routes. Additionally, the Board did not grant Allegheny's request that it adopt the broadest possible interpretation of the realignment issue. Instead, the Board defined the scope of investigation by reference to its previous order, affirmed that its prior delineation of the issues still controlled, and instructed Allegheny to submit specific realignment proposals consistent with that initial order.

Allegheny did submit specific realignment proposals a week before the prehearing conference, including for the first time requests for nonstop authority in the Islip and Bridgeport routes. The Board now contends that Allegheny's proposals gave Mohawk notice that these routes would be in issue, and that by failing to submit a motion for consolidation at this time,[4] Mohawk waived its right

---

4. According to the Board's regulations, a motion for consolidation must be filed not

later than the prehearing conference in the proceeding in which consolidation is

to have its applications for similar authority considered simultaneously with those of Allegheny. The Board insists that Allegheny's proposals provided Mohawk with adequate notice because in its second order "the Board had fixed the scope of the realignment issue by reference to Allegheny's proposals."

For this latter proposition we are able to find no support. According to the Board's regulations, its own orders are to define the scope of investigations which it initiates. 14 C.F.R. §§ 302.915 (b) and (c). Also, the Board's second order gave no indication of an intent to delegate this function to Allegheny—a procedure we would consider questionable. Rather, that order reiterated that the scope of the proceeding was to be as defined in its first order, and required Allegheny to submit proposals in conformity with that order. Moreover, the second order actually rejected Allegheny's expansive view of the realignment issue, which it appears Allegheny nevertheless ignored in formulating its specific proposals. Further, the Board's present contention that Allegheny's proposals were to fix the scope of the investigation is contradicted by the later statements of parties and the Examiner, all of whom obviously proceeded upon the assumption that the propriety of Allegheny's proposals depended upon their congruence with the Board's own statement of the issues.

Accordingly, we view Allegheny's proposals as giving Mohawk notice only that Allegheny would thenceforth seek to have these issues included in the investigation. We must agree with the Board that had Mohawk exercised an abundance of caution it would have immediately either objected to these realignment proposals or moved for consolidation. But, to penalize its failure to do so would place upon a party the great burden of divining every possible item which could conceivably be considered, thus putting a premium on a notice couched in broad or ambiguous terms. Moreover, in view of the strong indication previously given by the Board itself that such issues would not be considered in this proceeding, we do not believe Mohawk's failure to act at this time can fairly be considered a waiver. As we view them, Allegheny's proposals did not broaden the scope of the investigation at this time, they merely produced confusion.

Unfortunately, the prehearing conference did little to dispel the ambiguity. Although several parties objected to Allegheny's realignment proposals and requested clarification, the Examiner declined and merely reiterated that the proceeding would be confined to the issues as set forth in the two previous orders. With the benefit of hindsight, the Board now laboriously attempts to minimize the conflict between its description of the issues to be included in the investigation and Allegheny's realignment proposals. In particular, the Board emphasizes that Allegheny's proposals were not inconsistent with its repeated statements that no change in Allegheny's "basic authority" was contemplated. Thus, the Board explains, the purpose of a "route realignment" is to adjust the carrier's authority by removing unnecessary impediments to make its operation more economical and to improve its service between points on the carrier's existing route system as certified. Such realignment may include new grants of nonstop authority along existing routes as long as such grants do not have "significant competitive ramifications." Conversely, the Board would define a change in basic authority within an existing route system only as a change in the number of stops in a significant competitive market.

Although we have no doubt that the Board is free to adopt this definition of the term prospectively, it cannot now retroactively cure the conflict between its orders and Allegheny's realignment

---

sought. The Board will not entertain such a motion filed after that date "unless the movant shall clearly show good cause for his failure to file such motion on time." 14 C.F.R. § 302.12(b).

proposals. Even if we were to assume arguendo that Allegheny's Bridgeport and Islip proposals would not effect a change in any significant competitive market, a question we need not here consider, it is nevertheless clear from the record that the parties did not understand "a change in basic authority" to have the meaning which the Board now gives it. Thus, at the hearing, even the Examiner was of the view that a reduction of the number of stops in *any* market constituted a change in basic authority. In this situation, we can hardly find Mohawk unreasonable in relying on a similar interpretation of the term.

The Board further argues that even if Mohawk did not have adequate notice previously, it clearly was advised that Allegheny's proposals would be considered in the investigation after the Examiner made his rulings at the commencement of the hearing. Again, we find ourselves in disagreement.

In response to requests for further clarification of the Board's order, the Examiner responded, as set forth above, that he was of the view that no reduction in the number of stops in any market was in issue unless the Board had identified the particular market in its orders. But, with the obfuscation which seems to have marked these proceedings from their inception, he went on to consider Islip separately, ruling that because Islip was "hybrid situation" (whatever that may mean), he would permit it to be included for the purpose of allowing the Board to consider "what the effect of realignment would have on a point such as Islip."

Although the Board contends that this ruling made clear that the grant of non-stop authority in the Islip markets was in issue at this point, we find such an interpretation of the Examiner's statement quite dubious. It must be remembered that before addressing himself to the question of Islip, the Examiner had already reaffirmed his view that the scope of the investigation should be limited to the issues set forth in the Board's orders; and he had also interpreted those orders as excluding from consideration any reduction in the number of stops in any market which had not been specified. With these prefatory statements, the Examiner then went on to rule that he would take evidence pertaining to the Islip routes, which were on a segment specifically excluded by the Board's first order, so that the Board might have an opportunity to consider "what the effect of realignment would have on a point such as Islip." We believe the most reasonable interpretation of this "double-talk" is that evidence concerning Islip would be admitted for the purpose of informing the Board of the implications of realignments [on the 6 segments it had enumerated] which might result from the investigation, but not for the purpose of effecting any alterations in Allegheny's operations from Islip.

Accordingly, we must agree that there is some merit to Mohawk's suggestion that the most logical interpretation of the sequence of events outlined above is that the Examiner did not finally decide that changes in authority in the Islip and Bridgeport—Detroit markets were in issue until the time had arrived for writing his Initial Decision, and that similarly the Board did not decide that these routes were within the scope of the investigation until it decided to ratify his decision. Indeed, we are strongly supported in this interpretation by remarks made by the Examiner himself at the hearing. Thus, in response to numerous queries by the parties as to the proper interpretation of the Board's term "basic authority," the Examiner responded:

" * * * [O]bviously I think enough has been said to make it clear that the intention of the Board was no change in the basic authority. Obviously Allegheny has a different view of what basic authority is from perhaps other parties here, and there may be room for argument. *This is probably the difficulty that has been confronting the Board here and why it did not come to clearer grips with a mo-*

**16**

*tion for clarification* \* \* \* *I think this is something that the Board ultimately should decide.* \* \* \* " (Emphasis added.)

From these and other remarks by the Examiner, it appears that despite a previous petition for clarification made to the Board and repeated requests to the Examiner, both at the prehearing conference and at the hearing, the agency itself declined to determine with any reasonable degree of precision the issues it wished to include in the investigation until it actually rendered its decision. And we believe this obvious state of indecision was the cause for the inadequate notice to Mohawk by the Board that Allegheny's authority in the Islip and Bridgeport—Detroit markets might be expanded by the order resulting from the investigation.

Finally, we should note that the Board does not dispute that these grants of authority to Allegheny actually caused substantial prejudice to Mohawk. At the time of the issuance of the Examiner's Initial Decision granting nonstop authority to Allegheny in the Islip— Cleveland, Islip—Detroit and Bridgeport —Detroit markets, Mohawk had one-stop authority in each of these markets. Obviously, therefore, the expansion of Allegheny's authority placed Mohawk at a competitive disadvantage. Moreover, several months before the Examiner rendered his Initial Decision in the *Route 97 Investigation,* the Board had instituted the *Service to White Plains, N. Y.* case, which it later amended specifically to place in issue a possible award of nonstop authority in the Islip—Cleveland market. At the time of the Board's order in the *Route 97 Investigation* awarding Allegheny a certificate for such authority, four airlines, including both Allegheny and Mohawk, were actively seeking the same authority in the *White Plains* proceeding. Allegheny then argued in the *White Plains* investigation that it could not operate profitably in this market if a second carrier were certified; and on February 27, 1969, the Examiner rendered his Initial Decision

in the *White Plains* case concluding that no additional authority should be granted in this market.

Accordingly, we hold that Mohawk was denied adequate notice that nonstop authority in the Islip—Cleveland, Islip— Detroit and Bridgeport—Detroit markets was in issue in the *Route 97 Investigation,* and that it suffered substantial prejudice as a result because it was prevented from seeking timely comparative consideration of its own qualifications for such authority with those of Allegheny in accordance with its *Ashbacker* rights.

The petition to review and set aside that portion of Board Order No. 68–9– 73 which caused Allegheny to be issued a revised certificate of public convenience and necessity authorizing it to provide nonstop service between Islip—Cleveland, Islip—Detroit and Bridgeport— Detroit is granted, and the proceeding is remanded to the Board.