Lester C. JONES, William T. Fulton, Inter-State Milk Producers' Cooperative, Lehigh Valley Cooperative Farmers, Maryland Cooperative Milk Producers, Inc., Maryland and Virginia Milk Producers, Capitol Milk Producers Cooperative, Pennmarva Dairymen's Federation, Inc.

v.

Bob BERGLAND, Secty. of Agriculture of U. S., Dairylea Cooperative, Inc. & Northeast Dairy Cooperative Federation, Inc. and Tuscan Dairy Farms, Inc. (Intervenor).

Civ. A. No. 77–3271.

United States District Court,
E. D. Pennsylvania.

June 30, 1978.

---

636

Donald F. Copeland, Speese, Bongiovanni & Copeland, Philadelphia, Pa., for plaintiffs.

Harry Polikoff, Philip M. Hammett, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Eastern Milk Producers and Dairylea Nedco.

David W. Marston, U. S. Atty., Robert S. Forster, Jr., Philadelphia, Pa., Garrett B. Stevens, Washington, D. C., for Bob Bergland.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

Plaintiffs challenge the validity of a final partial decision and order of the defendant Secretary of Agriculture of the United States (Secretary) dated August 12, 1977, issued pursuant to an administrative rule-making proceeding, Docket No. AO–71–A71, regarding Federal Milk Marketing Order No. 2 (7 C.F.R. 1002) which regulates the marketing of milk in the New York-New Jersey Marketing area.  The final par-

tial decision regarding proposed amendments to Milk Marketing Order No. 2 was published in 42 Fed.Reg. 41582; the amended order became effective on November 1, 1977 as provided for by Final Rule of September 27, 1977, published in 42 Fed.Reg. 52379.

## FACTS AND PROCEDURAL HISTORY

The Agricultural Adjustment Act of May 12, 1933, 48 Stat. 31, as amended, 7 U.S.C. § 601, et seq., authorizes the Secretary to promulgate regulations called marketing orders to establish minimum prices and otherwise regulate the handling of milk in the particular marketing areas of the United States as designated by him. Pursuant to authority under the Agricultural Adjustment Act (Act), the Secretary has promulgated Order 2 to regulate the marketing of milk in North Jersey and the New York Metropolitan Area and other areas not relevant hereto; and Order 4 to regulate the marketing of milk in South Jersey and the Philadelphia Metropolitan Area and other areas not relevant hereto. Prior to the amendment of Order 2, the legality of which is the issue in this action, the basic Class I price in Order 2 was the basic formula price (7 C.F.R. 1002.50), plus an add-on of $2.40 (7 C.F.R. 1002.50a). The basic Class I price in Order 4 is the basic formula price (7 C.F.R. 1004.51) plus an add-on of $2.78 (7 C.F.R. 1004.50).

A classified price plan divides milk received by handlers into classes according to use and assigns appropriate minimum prices for the classes. Under each marketing order, the aggregate amount of milk used monthly in each of the classes by all handlers under the order is determined, and then multiplied by the applicable class prices. The total is then divided by the total number of pounds of milk in all classes. The resulting number (subject to certain adjustments) is the uniform price. Each producer (or if a member of a qualified cooperative, the cooperative) is entitled to receive this uniform price (subject to certain adjustments) for the pounds of milk delivered by him to handlers under the respective orders, regardless of the use made of the milk by the particular handler to whom the producer sold his milk. The handler however pays for the milk delivered to him based on his class use; and any difference between the prices so payable and the uniform price paid to the producers delivering milk to him, is adjusted through a fund—the Producer Settlement Fund—maintained under the particular order.

On January 9, 1976, the Secretary issued a notice of hearing for Order 2 which was published in the Federal Register, January 14, 1976, Volume 41, No. 9 at pages 2092 and 2093. The notice, insofar as it is relevant to issues herein considered, contained proposals for adjustment of certain location and transportation differentials in Order 2. The hearing was held at New York, New York on February 17–20, 1976 and at Syracuse, New York on February 23–26, 1976.

The final partial decision and order issued by the Secretary effectively reduced the Order 2 Class I price add-on (7 C.F.R. 1002.-50a(a)) from $2.40 to $2.25.[1]

The individual plaintiffs are producers of milk under Order 2 or Order 4. The corporate plaintiffs are associations of producers marketing the milk of their members in Orders 2 or 4 or in both Orders 2 and 4.[2]

Intervenor-defendants Dairylea Cooperative, Inc. and Northeast Dairy Cooperative Federation, Inc. market a substantial portion of the milk of their members under Order 2.[3] Intervenor-defendant Eastern Milk Producers Cooperative Association, Inc. is a cooperative corporation whose pro-

1. The preceding facts are taken from *Jones, et al. v. Bergland, Secretary of Agriculture of United States, et al.,* 440 F.Supp. 485 at pages 486–487 (1977); Findings of Fact Nos. 5–13.

2. Plaintiffs' Second Amended Complaint at pages 1–3, ¶¶ 1–3.

3. Answer of intervening defendants Dairylea Cooperative, Inc. and Northeast Dairy Cooperative Federation, Inc. to plaintiffs' complaint at page 2, ¶ 3.

ducer-members are subject to Order 2.[4] Intervenor-defendant Tuscan Dairy Farms, Inc. is a handler of Class I milk regulated under Order 2.[5]

Initially plaintiffs sought preliminary injunctive relief, urging that this Court enjoin the defendant Secretary from permitting Order 2, as amended, from becoming effective on November 1, 1977. A hearing on plaintiffs' motion for injunctive relief was held on October 13, 1977. In our Memorandum Opinion and Order of October 28, 1977, we denied plaintiffs' motion, concluding that plaintiffs would not sustain irreparable harm if the Order as amended was not stayed.

On December 16, 1977, a final hearing was held on this matter during which defendant and intervenor-defendants made a joint motion to dismiss plaintiffs' complaint, or in the alternative, for summary judgment under Fed.R.Civ.P. 12 and 56. We reserved ruling on that motion and permitted plaintiffs to proceed to trial without prejudice to the motion. The court admitted into evidence (1) the entire administrative rulemaking record in Docket No. AO–71–A71 which had been previously certified and filed with the court by defendant; and (2) the testimony of Paul E. Hand presented at the hearing for preliminary relief held on October 13, 1977, for the limited purpose of establishing the factual basis for plaintiffs' allegation of standing in this action. Following plaintiffs' presentation of their evidence, defendant and intervenor-defendants jointly moved for involuntary dismissal under Fed.R.Civ.P. 41(b) on the alleged ground that upon the facts and law plaintiffs had shown no right to relief. This motion was also made without prejudice to defendant and intervenor-defendants' preliminary motion and taken under advisement by this Court.

After careful consideration of the arguments made by counsel at the hearings, the evidence adduced, and the memoranda of law submitted, this Court finds that plaintiffs have in fact stated a cause of action and that there is a genuine issue as to a material fact, as will more fully appear in the balance of this Memorandum Opinion. Accordingly, we deny the said motions of defendant and intervenor-defendants to dismiss the complaint or in the alternative for summary judgment. We proceed directly to the merits of plaintiffs' case and on the basis of the entire trial record before this court we grant defendant and intervenor-defendants' motion for involuntary dismissal of this action under Fed.R.Civ.P. 41(b).[6]

Plaintiffs challenge the Secretary's action on both procedural and substantive grounds. The grounds averred in support of plaintiffs' prayer that this court enjoin the Secretary from enforcing the amendments promulgated by his decision and order of August 12, 1977 are as follows: (1) the notice of hearing was improper in that there was no notice of intention to consider a reduction in the Class I price; [7] (2) there was no record evidence to support a reduction in the uniform price because General Finding (b) of the Decision, finding that the producer minimum price must be reduced, was not supported by substantial evidence; [8] (3) the reduction of the Class I price was not supported by substantial record evidence; [9] and (4) the Secretary has no authority under the Act to equalize handler costs or to equalize handler costs at the expense of producers.[10]

---

**4.** Application for intervention of Eastern Milk Producers Cooperative Association, Inc. at page 2, ¶ 4.

**5.** Application for intervention of Tuscan Dairy Farms, Inc. at page 2, ¶ 3.

**6.** This Memorandum Opinion contains the findings required by Fed.R.Civ.P. 52(a).

**7.** Plaintiffs' Second Amended Complaint at 10, ¶¶ 36, 37.

**8.** Plaintiffs' Second Amended Complaint at page 9, ¶¶ 32, 33.

**9.** Plaintiffs' Second Amended Complaint at page 7, ¶¶ 24, 25.

**10.** Plaintiffs' Second Amended Complaint at pages 10–11, ¶¶ 39–41.

Preliminarily, it is noted that defendant and intervenor-defendants contest plaintiffs' standing to maintain this action and deny that this court has jurisdiction over this matter. We will address the questions of plaintiffs' standing and this Court's jurisdiction and then proceed to examine seriatim the grounds set forth in support of plaintiffs' claim for relief.

## STANDING AND JURISDICTION

As indicated, defendant and intervenors argue that neither plaintiff Order 2 producers nor plaintiff Order 4 producers have standing to maintain this action for the reason that plaintiffs' claim as pled falls outside of the limited area specified by case law wherein producers have standing to contest the Secretary's action under a marketing order which regulates their milk. Inasmuch as we determine that plaintiff Order 2 producers have standing to bring this suit, we do not reach the question whether plaintiff Order 4 producers, who are only indirectly affected by the amended order, have legal standing. We assume that they have standing.

Defendant and intervenors are correct insofar as they state that case law specifies a limited area in which producers have standing to contest the Secretary's action under a marketing order which regulates their milk.

In *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), Order 4 producers brought suit against the Secretary to enjoin him from carrying out certain provisions of marketing Order 4 which it was alleged would unlawfully divert funds which belonged to them. The contested provisions directed the market administrator to deduct a sum for the purpose of meeting certain payments to cooperatives.

Plaintiffs argued that the Act did not authorize the Secretary to include in his order provision for payments of that kind or for deductions to meet them. The court found that "the challenged deduction reduces *pro tanto* the amount actually received by the producers for their milk." *Stark v. Wickard, supra*, 321 U.S. at 302, 64 S.Ct. at 567, 88 L.Ed. at 744. The court noted that certain rights are vested in producers, stating:

> The statute [the Act] and Order create a right in the producer to avail himself of the protection of a minimum price afforded by Governmental action. Such a right created by statute is mandatory in character and obviously capable of judicial enforcement. *Stark v. Wickard, supra*, 321 U.S. at 303, 64 S.Ct. at 567–568, 88 L.Ed. at 744.

On the basis of plaintiffs' allegations that they had delivered milk to Order 4 handlers which entitled them to a minimum price which was subject to the illegal deductions, the court determined that plaintiffs had such a personal claim as justified judicial consideration. Accordingly, the court found that the plaintiff producers had legal standing to contest the alleged illegal provisions.[11]

■ *Stark* holds that the Act confers standing upon producers for the limited purpose of challenging unlawful administrator action which adversely affects their minimum price. We note that plaintiffs allege that the contested decision and order will immediately reduce the uniform price paid to Order 2 producers by shifting from Order 2 handlers to Order 2 producers the costs of hauling milk and by the reduction of the Class I price by 15 cents per hundredweight.[12] Additionally, plaintiffs allege that the Secretary's action will reduce the Producer Settlement Fund in Order 2.[13] Inasmuch as both the uniform price and the

---

**11.** Among noteworthy Circuit Court opinions and District Court opinions relying upon the authority of Stark in determining whether the producer plaintiffs therein had standing to bring suit are *Dairylea Cooperative, Inc. v. Butz*, 366 F.Supp. 1335 (S.D.N.Y., 1974), affirmed 504 F.2d 80 (2d Cir., 1974); *Blair v. Freeman*, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966); *Inter State Milk Producers' Coopera-*

*tive, Inc. v. St. Clair*, 314 F.Supp. 108 (D.Md., 1970).

**12.** Plaintiffs' Second Amended Complaint at page 8, ¶ 29.

**13.** Plaintiffs' Second Amended Complaint at pages 6–7, ¶ 21.

Producer Settlement Fund are aspects of the minimum price, plaintiffs effectively allege that the contested provisions will reduce their minimum price. As stated, plaintiffs aver in their second amended complaint that the Secretary's action is unlawful for the reasons that the notice of hearing is invalid, certain provisions are unsupported by substantial record evidence, and the Secretary lacks authority to equalize handler costs. This court finds that on the allegations of the complaint, the Order 2 producer plaintiffs have legal standing to challenge alleged unlawful action by the Secretary which adversely affects their minimum price.

Defendant-intervenor Tuscan Dairy Farms, Inc. argues that the above cases regarding producers' standing turn on the diminution of the Producer Settlement Fund or equalization pool. That is, Tuscan claims that the above referenced cases hold that producers are entitled to judicial consideration only where the primary impact of the contested action is upon the fund or pool as prescribed by the Secretary. We disagree. *Stark*, the seminal case on this matter, determines that producers are entitled to contest any unlawful governmental action which adversely affects their minimum price. See page 6, *infra*. The Class I price add-on is part of the minimum price assured producers. The fact that the Class I price add-on falls within that portion of the minimum price which handlers pay directly to producers rather than within the Producer Settlement Fund from which handlers make indirect payments to producers does not bar producer plaintiffs herein from judicial consideration of governmental action it is alleged unlawfully reduces the Class I price add-on.

However, even if producers are only entitled to challenge governmental action which unlawfully diminishes the Producer Settlement Fund, we find that the reduction of the Class I price add-on may ultimately reduce the fund, as plaintiffs allege.[14] If the reduction of the Class I price results in a reduction of the blend price, as plaintiffs argue, handlers could be required to pay less to the fund. The net effect of handlers' smaller payments to the fund would be a reduction thereof.

■ Defendant and intervenors also argue that plaintiffs are without standing for the reason that the amended order has been ratified by the statutorily prescribed two-thirds of the producers regulated thereunder. This argument is devoid of merit. The Supreme Court rejected a similar argument by the Secretary in *Stark v. Wickard* stating:

> . . . a mere hearing or opportunity to vote cannot protect minority producers against unlawful exactions which might be voted upon them by majorities. It can hardly be said that opportunity to be heard on matters within the Secretary's discretion would foreclose an attack on the inclusion in the Order of provisions entirely outside of the Secretary's delegated powers. *Id.*, 321 U.S. at 307, 64 S.Ct. at 570, 88 L.Ed. at 746.

In view of the fact that plaintiffs herein allege that the Secretary exceeded his legal authority in promulgating the contested decision and the amended order, the majority vote of Order 2 producers in support of the Secretary's action has no bearing on plaintiffs' standing to maintain this action.

■ The foregoing analysis and discussion of the relevant authorities discloses that Order 2 producer plaintiffs have standing and that this court has jurisdiction over the claims set forth. Nonetheless, we note in passing that intervenor-defendant Eastern Milk Producers' Cooperative Association, Inc. argues that plaintiffs have failed to exhaust their administrative remedies.[15] Recourse cannot be had to this court, intervenor claims, before administrative remedies are allowed to run their full course. It is important to note that intervenor does

---

14. *Id.*

15. Memorandum of Law of Intervenor Eastern Milk Producers Cooperative Association, Inc.

in Support of Motion to Dismiss, or in the Alternative, Summary Judgment at pages 8–10.

not identify an administrative remedy available to producers whereby they are afforded an opportunity to challenge unlawful agency action. Our reading of the Act is that no administrative remedy has been provided for producers. Other courts have come to the same conclusion. See *Stark v. Wickard, supra*, 321 U.S. at 309, 64 S.Ct. at 570, 88 L.Ed. at 747; *Dairylea Cooperative, Inc. v. Butz, supra*, 504 F.2d at 83; *Rasmussen v. Hardin*, 461 F.2d 595, 598 (9th Cir. 1972). Accordingly, we have jurisdiction over the instant matter.

## NOTICE

The Secretary is required by law to give notice of his intention to amend marketing orders. The controlling statute, 7 U.S.C. § 608c(3) provides in full:

Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order.

Title 5 U.S.C. § 553(b), *inter alia*, prescribes the content of the notice to be given by the Secretary. That section reads in relevant part:

The notice shall include—

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

This court is authorized by 5 U.S.C. § 706 to review the adequacy of agency notice. Subsection (2)(D) of Section 706 requires that this court hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law.

It is undisputed by the parties to this action and this court found as a fact in our Memorandum Opinion of October 28, 1977 at page 3, Fact Number 11 that:

On January 9, 1976, the Secretary of Agriculture caused to be issued a notice of hearing for Federal Order 2 which notice was published in the Federal Register, January 14, 1976, Volume 41, No. 9 at pages 2092 and 2093. The notice, insofar as it is relevant to issues herein considered, contained proposals for adjustments of certain location and transportation differentials in Federal Order 2.

Plaintiffs claim that the notice afforded them does not comport with the requirements of 5 U.S.C. § 553(b)(3) inasmuch as it made no mention of proposed amendments to the Class I price in Order 2. The silence of the notice in this regard, plaintiffs argue, deprived them and other dairy farmers in marketing orders surrounding Order 2 of administrative due process. This argument is advanced in spite of the fact that plaintiffs' representative appeared at the hearing and submitted a statement to the hearing record on the "20 Year History of Class I and Blend Prices in Orders 2 and 4" (Tr. 517–537 Vol. B [N.Y.]),[16] cross-examined other witnesses with respect to transportation and location differentials in Order 2 as compared to such differentials in Order 4 (Tr. 175–184 Vol. A [N.Y.]), submitted post-hearing brief, and filed exceptions to the Recommended Decision. However, the record seems to support plaintiffs' averment that they neither gave nor elicited testimony relative to the reduction of the basic Class I price add-on.

Plaintiffs rely on *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013 (3rd Cir. 1976) for the proposition that failure to include the reduction of the basic Class I price add-on among the class of proposed amendments noticed in the Federal Register deprived plaintiffs of administrative due process. *Wagner* involved a rule which modified the permissible failure rates as well as the performance criteria for an automotive device. Plaintiffs argued that notice afforded them was invalidated by the agency's failure to include in the notice consider-

---

**16.** The transcripts referred to are part of the administrative rulemaking record which has been certified to the court and admitted into evidence. These transcripts are referred to in the following manner: transcript page number, volume letter, hearing location.

ation of the performance criteria. The court agreed, stating that the inadequate notice deprived interested parties of an opportunity to comment on the rule. Defendant herein claims that *Wagner* is distinguishable from the instant matter on the ground that the automotive rule was promulgated in an informal rule-making proceeding whereas the milk marketing order was amended in a formal or adjudicatory type proceeding. Even though the rules in the respective cases were promulgated as defendant avers, *Wagner* is not rendered inapposite thereby. There is no legal authority for the implicit proposition underlying the distinction drawn by defendant, viz., that an agency is put to a higher standard of notice in the case of an informal proceeding than in the case of a formal proceeding. In both proceedings, the content of the notice afforded by the agency is governed by 5 U.S.C. § 553(b).

Nonetheless, we find *Wagner* to be distinguishable from the case *sub judice* on several other grounds. The court in *Wagner* predicated its holding on the fact that certain interested parties were denied notice by the agency's exclusion of the performance criteria from the notice. The court's analysis reflected a concern with the absence of comment from certain groups which were vitally affected by the matter excluded from the notice and included in the rule as finally promulgated. The proposals set forth in the instant notice apprised the parties who were vitally affected, i. e., Order 2 producers, of the Secretary's contemplated course of action, the correction of the intermarket misalignment in prices between Order 2 and Order 4. We note also that the *Wagner* notice was fairly circumscribed whereas the instant notice included a variety of proposals which effectively would have altered the minimum price of milk to Order 2 producers.

We find that the procedure followed by the Secretary afforded interested parties substantially more opportunities to participate fully and effectively in the rulemaking proceeding than did the procedure followed by the administrator in *Wagner.* The Act, 7 U.S.C. § 608c(8), provides in relevant part

that no marketing order shall be effective unless the Secretary determines that the issuance of the order is approved by two-thirds of the producers of the commodity proposed to be regulated by the order in the production area specified in the order. Given the number of opportunities, as set forth below, that interested parties were afforded to set forth their objections to the amended marketing order and their ability to reject through the referendum procedure the marketing order as finally promulgated for failure to reflect their objections, such defects as there are alleged to be in the notice were completely without prejudicial effect.

We note that the agency record in the *Wagner* case reflects the following chronology of events: (1) a notice of proposed rulemaking was published in the Federal Register which notice included in part a discussion of several proposed amendments. However, there was no discussion or reference to any proposed changes in the performance criteria or permissible failure rate for the motor vehicle device under consideration. (2) Thereafter, the administrator published in the Federal Register a series of amendments to a regulation which governs the vehicular device, based upon the initial notice of proposed rulemaking. Among those amendments was one which substantially modified the permissible failure rate for the automotive device. (3) In response to an objection by petitioner that the initial notice of proposed rulemaking did not contain a reference to a change in failure rates and that such omission warranted a withdrawal of the proposed amendment regarding the failure rates and a new rulemaking proceeding on proper notice, the administrator published an order striking the objectionable proposed amendment. Concurrently, however, the administrator published a new notice including a proposed amendment to modify the permissible failure rates for the automotive device. The new notice made no reference to a change in the performance criteria for the automotive device. Many segments of the automobile industry commented on the new proposal. Petitioner urged that the scope of the rulemaking

proceeding be enlarged to include consideration of the performance criteria for the device and that the agency issue an appropriate notice setting forth the new scope of the proceeding. (4) Notwithstanding the agency's acceptance of petitioner's position that the scope of the proceeding should be enlarged, the agency did not issue a third notice of proposed rulemaking and published instead a new standard for the automotive device which modified the permissible failure rates for the device and substantially downgraded the performance criteria. As stated, the court agreed with petitioner's argument that the agency was required to issue a third notice including a proposed amendment to modify the performance criteria for the device.

In contrast, the agency record in the instant case reflects the following: (1) The Secretary issued a notice of hearing for Federal Order 2 which was published in the Federal Register and contained in part proposals for adjustments of certain location and transportation differentials in Federal Order 2. As stated, plaintiffs' representative fully participated in the hearing. (2) Subsequent to the rulemaking hearing, plaintiffs and other interested parties filed proposed findings and conclusions and written arguments or briefs.[17] (3) Thereafter a recommended partial decision including the contested amendment which reduced the Class I price add-on was published in the Federal Register. (42 F.R. 18950). Interested parties were again afforded another opportunity to comment upon the proposed amendment to the marketing order by way of filing exceptions and supporting briefs to the proposed amendment. Plaintiffs' representative in fact filed exceptions and supporting briefs. (4) The final partial decision proposing, *inter alia,* a reduction in the Order 2 Class I price add-on was published in the Federal Register. (42 F.R. 41582). The decision also provided that a referendum of producers in Order 2 would be conducted to determine whether they favored issuance of the proposed amended order.

Approximately 80 producer members of the cooperatives belonging to plaintiff Penn-marva participated in the referendum and over 75 per cent of these producers voted in favor of the proposed marketing order. Over 92 per cent of all producers voting voted in favor of the proposed marketing order.

Clearly, then, interested parties in the instant case were given four opportunities to comment in some form upon proposed amendments to the marketing order; they were given two opportunities to comment upon the marketing order as finally amended. Moreover, interested parties were vested with the sweeping power to veto the Secretary's action. In contrast, interested parties in the *Wagner* case were not given a single opportunity to comment upon the rule therein as finally promulgated.

■ The thrust of plaintiffs' argument relative to notice is that agency failure to include in the notice of hearing every precise proposal adopted in the regulation as finally promulgated renders such notice invalid. In the course of reviewing orders of the Federal Communications Commission, the Ninth Circuit noted, "Title 5 U.S.C. § 553(b)(3), formerly 5 U.S.C. § 1003(a)(3), does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule." *California Citizens Band Association v. United States,* 375 F.2d 43, 48 (9th Cir. 1967), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). The Sixth Circuit, in reviewing an order of the National Traffic Safety Administration, stated, "It is clear that an administrative rule as adopted need not be identical to the proposed version of the rule." *Chrysler Corporation v. Department of Transportation,* 515 F.2d 1053, 1061 (6th Cir. 1975). A contrary rule would lead to the absurd result that in rulemaking under the Administrative Procedure Act, an agency could draw upon the comments tendered at a rulemaking hearing only at the peril of

---

**17.** See In the Matter of: Proposed Amendments to Tentative Marketing Agreements and Orders Regulating the Handling of Milk in the New York-New Jersey Marketing Area—Docket No. AO–71–A71, Part 9 of 10 Parts.

starting a new procedural round of commentary. *South Terminal Corporation v. Environmental Protection Agency*, 504 F.2d 646, 659 (1st Cir. 1974). Accordingly, the alleged variation between the noticed proposals and the amended order as finally adopted does not invalidate the notice of hearing in the instant case.

█ Compliance with the notice requirements of the Administrative Procedure Act is had where the rule as finally adopted does not differ substantially from the proposed rule. See *Chrysler Corporation v. Department of Transportation, supra; South Terminal Corporation v. Environmental Protection Agency, supra*. In view of the fact that the reduction of the Class I price add-on had substantially the same effect on the Order 2 blend price and the volume of Class I sales in Order 2 that several of the noticed proposals would have had on such price and sales, the absence of reference to a possible reduction in the Class I price add-on in the notice of hearing was neither fatal nor prejudicial. In this regard, it is important to note that certain testimony elicited by plaintiffs' representative was explicitly to the effect that a transportation credit in Order 2, a noticed proposal, would result in a reduction of the Order 2 blend price. (Tr. 173–179 Vol. A [N.Y.]).

Plaintiffs' reliance on *Mohawk Airlines, Inc. v. Civil Aeronautics Board*, 412 F.2d 8 (2d Cir., 1969) is also misplaced. The petitioner in *Mohawk* sought judicial review of an action by the *Board* which awarded authority for three non-stop airline routes to petitioner's competitor, Allegheny Airlines. Petitioner claimed that the Board did not provide it with adequate notice that non-stop authority for the airline routes would be at issue in the rulemaking proceeding. Additionally, petitioner claimed that it suffered substantial prejudice as a result of the lack of notice because the non-stop traf-

fic on the routes in question was not large enough to support more than one airline. The Second Circuit found the notice inadequate in view of its failure to even hint that non-stop route authority in contention would be included in the investigation. The court based its finding as to the inadequacy of the notice in part on its conclusion that petitioner "suffered substantial prejudice as a result because it was prevented from seeking timely comparative consideration of its own qualifications for such authority with those of Allegheny in accordance with its *Ashbacker* rights." *Mohawk Airlines, Inc. v. Civil Aeronautics Board, supra*, 412 F.2d at 16. The *Ashbacker* doctrine also weighed heavily on the Court's decision to rule the notice invalid. Under *Ashbacker Radio Corporation v. Federal Communication Commission*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), if an agency's award of one application for operating authority would be mutually exclusive as a matter of fact with the award of others before the agency, the competing applications must be considered contemporaneously. We note that in the instant matter, we have determined for reasons already stated that plaintiffs have not suffered prejudice in any form as a result of the absence of reference to a proposal regarding the Class I add-on in the notice of hearing. We underscore the fact that plaintiffs' views were before the Secretary by virtue of their exceptions and supporting memoranda to the proposed amended order. See page 649, *infra*.

## THE SUBSTANTIAL EVIDENCE ISSUE

█ The Agricultural Adjustment Act clearly provides that the Secretary is bound to issue an order on the basis of evidence adduced at a hearing. 7 U.S.C. § 608c(4).[18] The courts invariably read this provision of the Act in conjunction with a relevant provision of the Administrative Procedure Act

**18.** Title 7 U.S.C. § 608c(4) reads in full:
After [due] notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as

may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity.

646

which requires that reviewing courts hold unlawful and set aside agency action found to be unsupported by substantial evidence: 5 U.S.C. § 706. *Fairmont Foods Co. v. Hardin*, 143 U.S.App.D.C. 40, 45, 442 F.2d 762, 767 (1971); *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 315 (3rd Cir. 1968), cert. den. 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969); *Abbotts Dairies Div. of Fairmont Foods Co. v. Butz*, 389 F.Supp. 1, 7 (E.D.Pa.1975); *Abbotts Dairies Div. of Fairmont Foods, Inc. v. Hardin*, 351 F.Supp. 561, 564 (E.D.Pa.1972). Accordingly, the function of this court is to determine whether on the record as a whole there is substantial evidence to support the Secretary's decision and amended order. We note, however, that the Third Circuit has cautioned the District Courts in this regard, stating that such courts "[are] not free to draw [their] own independent inferences and conclusions from the record." *Lewes Dairy, Inc. v. Freeman, supra*, 401 F.2d at 317. Additionally, District Courts are not to decide questions of credibility. *Lamont v. Finch*, 315 F.Supp. 59, 61 (W.D.Pa.1970).

■ Substantial evidence has been defined as relevant evidence that a reasonable person might accept to support a conclusion. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140 (1966). The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence. *National Labor Relations Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305, 1307 (1942).

■ The Third Circuit determined in *Lewes Dairy, Inc., supra*, that the burden of proving that an agency determination is unsupported by substantial evidence in the record falls on the party challenging the agency determination because there attaches to the determination of an administrative agency a presumption of the existence of facts justifying the determination. Id., at 316. Applying this standard to the instant action, it was incumbent upon plaintiffs to demonstrate the absence of substantial evidence in the record in support of the Secretary's determination. After careful examination of the administrative hearing record and analysis of the evidence therein in accordance with the teachings of the aforesaid cases regarding substantial evidence, this court finds that there is in fact relevant evidence that a reasonable person might consider adequate to support the Secretary's determination. Accordingly, plaintiffs have failed to sustain their burden of proof on the question of substantial evidence.

Plaintiffs vigorously argue that there is neither substantial nor any record evidence in support of the Secretary's action. In plaintiffs' view, all of the evidence at the hearing concerned a problem of dealing with increased costs of assembling and transporting supply plant milk in Order 2, which milk incurs reload costs not incurred by milk which is shipped directly to the plant without reloading.[19] Generally speaking, defendant and intervenor-defendants would appear to accept this characterization of the evidence introduced at the hearing. It is noted that in the Order 4 market, producer milk is priced at the location of the plant where the milk is first received. Under this pricing arrangement, the cost of hauling the milk to the plant of first receipt by the handlers is borne by Order 4 producers. Therefore, Order 4 handlers' minimum costs under the order are not affected by these hauling costs, or any increase in such costs. See the affidavit of Herbert L. Forest, Director, Dairy Division, Agricultural Marketing Service, United States Department of Agriculture, dated October 12, 1977 ¶ 8 at pages 5–6.

■ Plaintiffs claim that the problem of increased costs of assembling and transporting supply plant milk in Order 2 was discussed for the alleged reason that Order 2 handlers were competing with Order 4 handlers in North Jersey.[20] We note

**19.** Plaintiffs' Trial Brief at page 2.

**20.** Id.

that mere competition among handlers of different marketing orders or among producers of different orders does not contravene the declared policy of the Agricultural Adjustment Act; a finding that there exists disorderly marketing conditions in an order does in fact contravene the policy of the Act. See 7 U.S.C. § 602. The Secretary found such conditions to exist in Order 2 on the basis of the evidence adduced at the hearing; such a finding requires corrective action. The record reflects that plaintiffs have significantly understated the evidence on the issue of "competition" among Order 2 handlers and handlers in other marketing orders for Class I sales in North Jersey. Richard Redmond, President of Dairylea Cooperative and Director of NEDCO, appearing as a policy witness on behalf of Dairylea and NEDCO, intervenors herein, stated at the administrative hearing:

> Under existing circumstances, Order # 2 handlers are operating at a competitive disadvantage with those handlers making sales in the Order # 2 marketing area from other Federal order markets. Costs to Order # 2 handlers for fluid milk are as much as 46 [cents] per cwt., or 1 [cent] per quart, over their competition. In the manufacturing class their costs exceed those in other markets by about 11 [cents] per cwt.
>
> Because of this fluid milk price disparity, there has been a steady increase in the sale of packaged fluid milk into the Order # 2 marketing area. Most of this milk is from Order # 4, but in the last 12 months, Order # 15 has also shown a fairly large increase. (Tr. 86 Vol. A. [N.Y.])

Dr. Robert F. Story of Cornell University, also testifying in behalf of the Dairylea-NEDCO proposals, stated in regard to the marketing conditions for Class I sales in Order 2:

> The steady increase in sales of packaged Class I from other orders in the Northern New Jersey Market has had a depressing effect on blend prices in Order 2. . .

In 1974 and 1975, these sales have increased 14 percent each year. If sales continue to expand at this rate over the next 5 years, an additional loss of nearly 300 million pounds of Class I sales would result, bringing total sales of packaged milk from other orders to more than 620 million pounds. This refers to sales of package milk in the Northern New Jersey part of the marketing area only. (Tr. 144–145 Vol. A. [N.Y.]).

Furthermore, exhibits were admitted into evidence at the administrative hearing containing, *inter alia*, statistical tabulations on intermarket shipments of milk, plant handlers and bulk tank units subject to Order 2. These exhibits tend to support the position that there existed disorderly marketing conditions in Order 2. The foregoing quoted remarks and the economic data exhibits are illustrative of the substantial evidence underlying the Secretary's implicit conclusion that there was a serious misalignment of prices for Class I milk between Order 2 and Order 4 and that as a result of this misalignment Order 2 producers and handlers were losing Class I sales in the North Jersey portion of the Order 2 market to lower priced milk from Order 4. Such evidence provides an adequate basis for the Secretary's finding that the policy of the Act was being contravened and that corrective action was necessary.

Plaintiffs further claim that the thrust of the hearing evidence was to shift the additional reload costs incurred by supply plant milk in Order 2 to producers in order to equalize handlers' costs to make them more competitive with Order 4 handlers in North Jersey.[21] We find substantial agreement among all the parties to this action that there is substantial evidence in the record in support of shifting the increased costs of assembling and transporting supply plant milk to Order 2 producers. The various proposals advanced by the participants in the administrative hearing reflect the participants' differences as to how such costs should be shifted to the producers and to what degree producers should

---

21. Id.

bear such costs. Plaintiffs claim that all of the evidence introduced at the hearing favored solving the problem through adjustments of the location and transportation differentials to take into account the increased costs of assembling and transporting supply plant milk.[22] In plaintiffs' view, the record is barren of evidence in support of solving the problem by means of adjusting the Class I price or the Class I differential. Close scrutiny of the hearing record indicates that there is substantial evidence to the contrary. Dr. C. W. Pierce, Professor Emeritus of Penn State University, appearing in behalf of Tuscan Dairy Farms, intervenor-defendant herein, and Queens Dairy Farm, both of Union, New Jersey, specifically discussed the possibility of lowering the Class I price. Testifying in behalf of proposal 4 included in the notice of hearing,[23] Dr. Pierce stated:

> Proposal No. 4 would have the same effect on handlers' costs as would lowering the Class I price 25 cents on all milk originating beyond the 140 mile zone. . . . As I interpret Proposal No. 4 the reduced value [of supply plant milk] would be reflected in the Class I price but the reduction in the Class I value would be shared among all producers including those closer to market than the 140 mile zone. (Tr. 553 Vol. D [Syr.])

Dr. Pierce also spoke in behalf of alternatives to proposal 4 which, like the decision and amended order promulgated by the Secretary, would result in a reduction of the Class I price. Dr. Pierce stated:

> An alternative would be to adopt f. o. b. plant pricing and then adjust the transportation differentials for all milk moving through reload stations and country plants a sufficient amount on average to align f. o. b. city and country plant prices. The effect of such a change would be to

reduce the Class I price in the 201–210 mile zone and at all reload points. (Tr. 554 Vol. D [Syr.])

He also stated subsequently:

> A better way would be to increase the direct delivery differential by 5 cents (Proposal No. 5) and reduce the Class I mark up over M–W [Minnesota-Wisconsin price] by 5 cents. (Tr. 557 Vol. D. [Syr.])

We note parenthetically that the decision and amended order, *inter alia*, increased the direct delivery differential and reduced the Class I mark up or Class I add-on, albeit well beyond the degree urged by Dr. Pierce.[24] Under cross-examination by Willard Blanchard, the Marketing Specialist of the United States Department of Agriculture, Dr. Pierce discussed the possible adjustment in the Class I price as a means of correcting the misalignment of prices between Order 2 and Order 4. In response to a question by Mr. Blanchard, Dr. Pierce states in part:

> I presume—I know that I am leaving to the Secretary considerable leeway in how he lines up prices. In opposing the negotiable tank truck service charge, it is our thought that the price—there should be a fixed Class One Price and that that price should be line [sic] up at the market and then lined up away from the market by the cost of moving the milk to the market. *If that requires lowering the Class One Price, we think that's what should be done.* (emphasis provided) (Tr. 591–592 Vol. D. [Syr.])

In discharging his function under the Act, the Secretary was not bound to adopt the precise proposals recommended by the witnesses at the administrative hearing. It was well within the scope of his authority to adopt an alternative means of accomplishing an end endorsed by many witnesses. The Pierce testimony is indicative of

22. Id.

23. Proposal No. 4 reads as follows:
   Add a new § 1002.57 to be captioned "Metropolitan Transfer Credit", which would provide for the computation of credit to a handler at the rate of 25 cents per hundredweight on all Class I milk originating beyond the 140-mile zone and transferred in bulk to

plants within the 65-mile zone from the mileage zone basing point specified in § 1002.51.

24. The final decision and amended order of the Secretary, in part, increased the direct delivery differential from 5 cents to 15 cents per hundredweight and reduced the Class I differential of $2.40 at the base zone by 15 cents, to $2.25.

the sentiment expressed by several witnesses that corrective action by the Secretary could require reducing the Class I price. The fact that Pierce and other witnesses may have favored reducing the Class I price by means other than those finally adopted by the Secretary is not controlling on the Secretary's discretionary right to accomplish that end by means substantially similar to those favored.

■ This court notes also that at various points in the administrative hearing, witnesses spoke in terms of general guidelines for corrective action, under which the decision and amended order clearly fall. Dr. Story stated:

> To overcome the problem of class price relationship with Order 2 and between Order 2 and Order 4, adjustments must be made in Order 2 to offset differences in the amount of the assembly costs that handlers incur. . . .
>
> Because of the variety of assembly cost components involved, it is impossible to correct the current price relationship problem with a single or simple order change. A series of changes are essential to bring Class I price into proper relationship so that handler costs for Class I milk in Order 4 and in different zones of Order 2 are as similar as practically possible.
>
> Adjustments in Order 2 must be made to permit handlers to offset the costs they incur for farm to plant hauling of Class I and Class II milk, for reload plant operations, and for over-the-road hauling. (Tr. 128–129 Vol. A. [N.Y.]).

The foregoing remarks demonstrate that the administrative hearing record fully supports the Secretary's decision and amended order insofar as they result in the reduction of the Class I price.

## THE SECRETARY'S ALLEGED MODIFICATION OF THE MINIMUM PRICE WITHOUT CONSIDERATION OF THE REQUISITE FACTORS

■ Plaintiffs argue that the defendant Secretary violated 7 U.S.C. § 608c(18) which provides that before the Secretary may modify the minimum price which handlers must pay to producers under § 608c(5)(A), the Secretary must fix reasonable prices based upon a hearing record which considers the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand. It is plaintiffs' position that the Order 2 minimum price was modified by the Secretary without consideration of the aforesaid factors. The administrative hearing record does not support plaintiffs' position. On February 23 and 24, several Order 2 dairy farmers testified on the subject of their costs, including feed costs.[25] Additionally, certain exhibits admitted into evidence were based in part on data regarding the availability of feeds. Although some farmers testified that their operating expenses had increased, the Secretary was not bound thereby to increase their minimum price. After considering all relevant factors, including the misalignment of prices between Order 2 and Order 4, a factor which vitally affected market supply and demand in Order 2, the Secretary determined that the minimum price for Class I milk in Order 2 should be reduced. We note in this regard the Secretary's statement in his decision of August 17, 1977, which statement reads in part:

> A group of cooperatives in the Middle Atlantic market [i. e., the Order 4 market] argued in their exceptions to the recommended decision that the record does not support a reduction in the Class I differential. Exceptors claimed that the record did not show that the cost of producing milk had declined in the Order 2 market but rather that it showed that such costs had increased and that returns to producers were not keeping pace with the rising costs. The cooperatives contended that a Class I price decrease would be contradictory to the higher production costs.

---

**25.** See In the Matter of: Proposed Amendments to Tentative Marketing Agreements and Orders Regulating the Handling of Milk in the New York-New Jersey Marketing Area—Docket No. AO 71–A 71, Part 3 of 10 Parts.

The resolution of the complex pricing issues involved in this proceeding cannot be contingent upon the maintenance of the current level of returns to Order 2 producers. Any action to make Order 2 milk more competitive ·with Order 4 milk necessarily requires some reduction in returns. The proponent cooperatives fully realized that their proposals would have this effect. . . . Although some producers testified at the hearing that the maintenance of the present level of returns should be an overriding consideration, such testimony was presented on behalf of a relatively small segment of the market's producers. It is noted that while the Order 4 cooperatives .objected to a reduction in the Class I price they did not oppose other provisions adopted herein that would reduce returns to Order 2 producers. No weight can be given to the cooperatives' exceptions on this point. 42 Fed.Reg. 41582 at 41592.

Accordingly, we find that the Secretary has not violated the terms of Section 608.

### THE SECRETARY'S EQUALIZATION OF HANDLER COSTS

 Plaintiffs argue that the Secretary has no authority under the Act to equalize handlers' costs at the expense of producers. However, the declared policy of the Act as stated in 7 U.S.C. § 602(4) is, "[t]hrough the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for any agricultural commodity enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices." In the instant action, the interests of Order 2 producers and Order 2 handlers dovetailed to a substantial degree. To the extent that Order 2 handlers were unable to compete effectively for Class I sales in the North Jersey area of Order 2 because of the price disparity between Order 2 and Order 4, Order 2 producers were injured. The decrease in sales resulted in a lower Class I

utilization in Order 2 and depressed the producer blend price in Order 2. The Secretary's equalization of handlers' costs was designed to re-establish competitive equality between Order 2 handlers and handlers in nearby marketing orders, particularly Order 4 handlers, such that over the long run the Class I utilization in Order 2 and the Order 2 blend price would increase. Given the symbiotic relationship between Order 2 producers and Order 2 handlers, we cannot find that the Secretary's action was at the expense of the producers. His action was calculated to further the interests of producers in Order 2, an. object expressly within the declared policy of the Act. Accordingly, we find plaintiffs' argument that the Secretary exceeded his authority in equalizing handler costs to be without merit.