IT IS FURTHER ORDERED that judgment be entered against the defendants in the amount of $32.60.

**LEHIGH VALLEY FARMERS, et al.**

v.

**John R. BLOCK, Secretary of Agriculture.**

**FARMERS' COOPERATIVE DAIRY, INC., et al.**

v.

**John R. BLOCK, Secretary of Agriculture.**

Civ. A. Nos. 85–6422, 85–6484.

United States District Court, E.D. Pennsylvania.

July 17, 1986.

John Wertz, Robesonia, Pa., J. Jackson Eaton, III, Allentown, Pa., Marvin Beshore, Harrisburg, Pa., for plaintiffs.

Garrett E. Stevens, Gregory Cooper, Washington, D.C., Alexander Ewing, Jr., Asst. U.S. Atty., Philadelphia, Pa., for Dept. Agriculture.

Gregory Romano, Dep. Atty. Gen., Trenton, N.J., Wm. T. Campbell, Philadelphia Pa., for State of N.J.

Frederick Micale, Syracuse N.Y., Marcy B. Tanker, Esq., Philadelphia, Pa., for Eastern Milk Prod. Co-op.

Donald F. Copeland, Norristown, Pa., for Pennmarva Dairymen Co-op. Federation.

David C. Toomey, Philadelphia, Pa., for intervening Proprietary Handlers.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

The above named plaintiffs instituted these actions, consolidated for purposes of disposition, seeking relief in the form of a preliminary injunction prohibiting the Secretary of Agriculture from implementing regulations which would amend the Middle Atlantic (Order 4) and New York-New Jersey (Order 2) Milk Marketing Orders so as to include twenty (20) additional counties of East-Northeast Pennsylvania within the boundaries of said orders.[1] *See* 50 Fed. Reg. 45595 (1985). This Court granted the preliminary injunction on November 22, 1985, following four (4) days of hearings. The plaintiffs presently seek a permanent

---

1. The Final Rule as promulgated by the Secretary would add the fifteen (15) Pennsylvania counties of Bradford, Columbia, Lackawanna, Luzerne, Lycoming, Monroe, Montour, Northumberland, Pike, Snyder, Sullivan, Susquehanna, Union, Wayne and Wyoming to Order 2. The five (5) Pennsylvania counties of Berks, Carbon, Lehigh, Northampton and Schuylkill would be added to Order 4. *See* 50 Fed.Reg. 32717 (1985).

injunction prohibiting implementation of said regulations on the grounds that: (1) the Secretary's "Findings and Conclusions" in support of his decision are unsupported by substantial record evidence as required by the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(E), and the Agricultural Marketing Agreement Act of 1937 (AMAA), 7 U.S.C. § 608c(4); (2) the Secretary's decision is arbitrary and capricious, 5 U.S.C. § 706(2)(A); and (3) the Secretary's decision was based upon extra-record evidence in violation of the APA, 5 U.S.C. § 556(e), and the AMAA, 7 U.S.C. § 608c(4).[2] Prior to addressing the plaintiffs' challenges to the Secretary's decision, we must first dispose of the government's motion to dismiss certain of the plaintiffs and outstanding motions to intervene in support of and in opposition to the Secretary's decision.

## I. STANDING AND JURISDICTION

A number of parties sought to intervene in this dispute subsequent to the plaintiffs' initiation of these actions. Motions to intervene as defendants were filed by four (4) different groups: the Pennmarva Dairymen's Cooperative Federation on behalf of its member cooperatives, Eastern Milk Producers Cooperative Association, Inc., the State of New Jersey's Department of Agriculture, Division of Dairy Industry, and a group of private, independently owned proprietary handlers. Motions to intervene as plaintiffs have been filed by three (3) private, independently owned proprietary handlers: Freeman's Dairy, Stocker Brothers Dairy, and Clover Farms Dairy. The Chief Counsel for Advocacy of the Small Business Administration also sought to intervene as *amicus curiae* in opposition to the decision of the Secretary. He has since withdrawn his motion without explanation.

We granted the Pennmarva motion to intervene as a defendant on November 22, 1985. We took the remaining motions to intervene under advisement and instructed the parties to proceed as though such motions had been granted. We also took under advisement the government's motion to dismiss those plaintiffs which function as handlers on the ground that they lacked standing to prosecute this case because they failed to exhaust the administrative remedies available to them under the AMAA. *See* 7 U.S.C. § 608c(15)(A).[3] The government for the same reason objects to the intervention on behalf of the plaintiffs of any of the proprietary handlers, *viz.,* Freeman's, Stocker Brothers and Clover Farms.

The parties to these actions, both potential and actual, represent the entire spectrum of entities involved in the dairy industry: producers (dairy farmers), handlers—both independently and cooperatively owned, and the government. The dispute as to standing centers on those entities which function as handlers, *i.e.,* those who process raw milk for consumer consumption.

▆ The Supreme Court in *United States v. Ruzicka,* 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946), held that a handler had no standing to challenge the validity of a marketing order promulgated by the Secretary of Agriculture as a defense to an enforcement proceeding brought by the USDA since the AMAA provided handlers with an administrative forum for a determination of the handlers' obligations. The Supreme Court's holding in *Ruzicka* has been construed to require that a handler in all cases first exhaust his formal administrative remedies before obtaining judicial review of any rule promulgated by the Secretary pursuant to the AMAA. *See*

---

**2.** Counsel for the "proprietary handlers" intervening on behalf of the government do not expressly challenge the applicability of §§ 556 and 557 of the APA to rulemaking proceedings conducted pursuant to the AMAA. However, at times in his brief, he "questions" the applicability of the "formal rulemaking" provisions of the APA. The Department of Agriculture itself, however, operates under the premise that the

requirements of formal rulemaking apply. We find no reason to conclude otherwise. *See* 50 Fed.Reg. 32716 (1985).

**3.** The government's motion to dismiss pertained to three (3) of the plaintiffs: Atlantic Processing, Inc., Guers Dairy, Inc., and Valley Farms, Inc.

*Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). The Supreme Court had earlier stated, however, that producers of milk who met all other criteria had standing to challenge a rule promulgated by the Secretary since the AMAA provided them with no administrative remedy comparable to that available to handlers. *See Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *see also, Block v. Community Nutrition Institute, supra; Suntex Dairy v. Bergland,* 591 F.2d 1063 (5th Cir.1979); and *Dairylea Cooperative, Inc. v. Butz,* 366 F.Supp. 1335 (N.D.N.Y.1973), *aff'd.* 504 F.2d 80. It is also entirely reasonable to conclude that an organization representing and composed of such producers possesses standing to challenge a rule promulgated by the Secretary pursuant to the AMAA. However, a potential problem is created by the fact that many of the entities described above are "hybrid" in nature. For example, Atlantic Processing, Inc., (API), is a handler as defined under the AMAA. API is also a federation of cooperatives, qualified under the Capper Volstead Act, 7 U.S.C. § 608b, as is Pennmarva. Similarly, Farmers' Cooperative Dairy is a handler, but it is also the representative of its member producers. The government has made no motion to dismiss Farmers' Cooperative, presumably because it recognizes that the producers who own the Cooperative could simply have been named as individual plaintiffs rather than bringing their action as a collective entity. Applying the same logic to API, we see no need to distinguish between a single cooperative and a collection of cooperatives. In either case, the member producers could simply have brought these actions in their own names. Hence, we deny the government's motion to dismiss API from these actions.

██ Two of the plaintiffs, however, are simply proprietary handlers, as are the three (3) dairies seeking to intervene on the plaintiffs' behalf. For the reasons stated above, *i.e.,* failure to exhaust, we must grant the government's motion to dismiss Guers Dairy, Inc., and Valley Farms, Inc.,

and deny the motions to intervene filed on behalf of Clover Farms Dairy, Stocker Brothers and Freeman's. The plaintiffs' primary argument in contending that we should allow these proprietary handlers to participate in this litigation is that some injustice will be worked upon them if they are denied status as parties and we grant the motion to intervene filed on behalf of the proprietary handlers which support the Secretary's decision. This may be the case; however, such has always been true since *United States v. Ruzicka, supra,* and it is not the result of any deliberate injustice but rather of the statutory and regulatory scheme established by Congress. Section 608c(15)(A) of the AMAA would be rendered meaningless by F.R.Civ.P. 24(a)(2) were we to accept the plaintiffs' arguments since in almost all cases there would be producers willing to initially put forth the handler's position so as to open the courthouse doors for those handlers. Their arguments in this regard are without merit, as are their arguments that if they are dismissed and/or denied intervention, the proprietary handlers seeking to intervene on behalf of the government should be similarly denied intervention. It is obvious that those who support the government's position stand in different shoes than those who challenge it; the proponent proprietary handlers need only satisfy the requirements of F.R.Civ.P. 24(a) or (b). The motion of those proprietary handlers seeking to intervene on behalf of the government will be granted, as will the motion of Eastern Milk Producers Cooperative Association, Inc., because we find them to have satisfied the requirements of F.R.Civ.P. 24(a)(2). The motion to intervene filed on behalf of the State of New Jersey will be denied, however, because we find that it fails to fulfill the requirements of either F.R.Civ.P. 24(a) or (b). Regarding Rule 24(a)(2), the State has alleged no harm which will result to the State itself as a result of this litigation. Further, the State's proposed answer expresses nothing that is not already before this Court. Similarly, the State has expressed no interest

in the outcome of this litigation which would justify its intervention under Rule 24(b). Finally, under either Rule 24(a) or (b), the State's motion to intervene is untimely.

## II. THE SECRETARY'S DECISION

The regulatory scheme created by the AMAA has been fully analyzed by fellow courts, and we see no need for a lengthy review of the Act and the regulations promulgated pursuant thereto. *See e.g., Smyser v. Block*, 760 F.2d 514 (3d Cir. 1985). It suffices to say the Act's purposes are:

> to establish and maintain orderly marketing conditions for the covered commodities that will result in parity prices to farmers, to protect consumers in approaching the parity prices, to establish and maintain standards for commodities, to insure an orderly flow of the supply of commodities to market, and to avoid the disruption of orderly marketing through continued regulation. Regulation is accomplished, in part, by the issuance of orders by the Secretary of Agriculture ("the Secretary") that establish a uniform minimum price to be paid to "producers" by "handlers", (*i.e.*, those dairy farmers who manufacture raw milk into bottled milk and other products).

*Suntex Dairy v. Block*, 666 F.2d 158 at 160.

Congress enacted the AMAA to halt, *inter alia*, competition between producers for sales of milk which would be utilized by handlers for fluid purposes. Milk utilized in this manner, commonly referred to as Class I milk, has traditionally brought a higher price than milk used for "manufacturing" purposes, *e.g.*, cheese, ice cream, butter, *etc.* The Secretary of Agriculture, through the AMAA, seeks to prevent such competition by forcing all producers in a defined market to share equally in the burden created by excess milk, *i.e.*, milk in excess of that needed for fluid purposes. By forcing handlers to pay producers an average or "blend" price based most commonly on a marketwide pool, the producers no longer have cause to attempt to underprice their neighbors, thereby driving down the price of milk, and handlers can no longer play fellow producers off against one another.

In this instance, as stated earlier, the Secretary seeks to amend Orders 2 and 4 so as to include twenty (20) previously federally unregulated counties within the geographic boundaries of said orders. The Secretary in the form of "Findings and Conclusions" sets forth a number of reasons as to why he believes expansion of Orders 2 and 4 is necessary to effectuate the purposes of the AMAA.[4] We discern them to be as follows:

(1) the ability of some plants under Order 2 to distribute "unpriced" milk in the expansion area has had an adverse competitive impact upon those handlers regulated by Order 2 who do not use unpriced milk for their distribution in the area and upon all handlers regulated by Order 4 who distribute in the area. 50 Fed.Reg. 32720 (1985);

(2) "some of the reserve milk supplies associated with Schuylkill Haven plant's fluid sales in the (20)–county area is (sic) carried by Order 4 producers". 50 Fed. Reg. 32721 (1985);

(3) when certain conditions prevail, "some of the non-federally regulated handlers in the (20)–county area have ceased receiving milk from some dairy farmers" to maintain their high Class-I utilization and at least some of these farmers now deliver milk to Federal han-

---

4. This Court feels it would be remiss if it did not note the difficulty it had in extracting the relevant Findings and Conclusions from the Secretary's decision. While entitled "Findings and Conclusions", 50 Fed.Reg. 32717 (1985), the content of this section of the Secretary's decision is to a great extent only a summary of positions presented by opponents and, to a greater extent, proponents of expansion of the Federal orders. The manner in which the Secretary chose to state his Findings and Conclusions served to greatly obscure and obfuscate his decision. It would appear that the Secretary, unsure as to what was necessary for the amendments to Orders 2 and 4 to pass muster, decided to include as much as possible in his decision.

dlers, "which is another example of Federal order producers carrying the burden of the reserve supplies for these local dealers". 50 Fed.Reg. 32721–32722. (1985);

(4) "since the Class I sales in (the 20–county area) have now become an integral part of the Middle Atlantic and New York-New Jersey markets, it is only reasonable to provide that all dairy farmers associated with each of these two Federally regulated markets share equally in each respective market's total Class I sales". 50 Fed.Reg. 32723 (1985); and

(5) "the reasons given by the Assistant Secretary in his 1975 decision for not including under Federal regulation the (20)–county area no longer exist today", *i.e.*, market conditions have changed. 50 Fed.Reg. 32722 (1985).

Based on these Findings and Conclusions, the Secretary reasoned that Orders 2 and 4 should be expanded so as to encompass the 20–county area.[5]

The AMAA provides little or no guidance as to how a marketing area should be defined. *See* 7 U.S.C. § 608c(11)(A). Thus, the burden has fallen upon the Secretary of Agriculture to draw boundaries for marketing orders pursuant to his administrative discretion. Counsel for the government has made no argument that the Secretary's authority to define the geographic boundaries of marketing areas is committed to the agency's discretion so as to preclude judicial review of his decision. *See Suntex Dairy v. Block, supra,* and 5 U.S.C. § 701(a). Rather, counsel for the government argues that the Secretary in his decision has operated within criteria which have already received judicial approval. Specifically, he states that the Secretary's decision is based upon an analysis of the interrelationships between Orders 2 and 4 and the expansion area in terms of inter-market competition in distribution, common production areas and common reserve supply. (Brief of USDA, pp. 10–11). *See Suntex Dairy v. Block, supra,* and *United States v. Mills,* 315 F.2d 828 (4th Cir.1963), *cert. denied,* 375 U.S. 819, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963). Implicit in the government's recognition of these standards of common areas of production, distribution and reserve supply is its realization that absent these factors, the Secretary's order would not tend to effectuate the policies of the AMAA, *viz.,* "that in an *interrelated market* there should be uniform handler cost and a uniform price to producers based on all producers sharing equally in the benefits of the fluid milk and the burden of the manufacturing milk" associated with that market. (Brief of USDA, p. 12). (Emphasis added). It is to these component factors that the Secretary's Findings and Conclusions refer.

This analysis creates two issues which circumscribe these entire proceedings. The first issue: whether the administrative record before us contains substantial evidence to support the Secretary's factual determination that the Class I sales in the expansion area have become an integral part of the Order 2 and 4 markets in terms of distribution and reserve supply. The second issue: assuming the expansion area has *not* become an integral part of Orders 2 and 4 because Order 2 and 4 handlers cannot compete with non-federally regulat-

5. The defendant/intervenors expressed a variety of reasons as to why the decision of the Secretary should be upheld. To the extent their arguments were relevant to the reasons enunciated by the Secretary for expansion of Orders 2 and 4, the arguments of the defendant/intervenors were considered. However, to the extent their arguments were only additional reasons for expansion of the Orders not expressed by the Secretary in his decision, their arguments were irrelevant and thus not considered. We are required to "review agency decisions only on the basis of the reasons given in the agency's order or opinion". *Saylor v. United States De-* *partment of Agriculture,* 723 F.2d 581, 582 (7th Cir.1983). *See also, Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 45´, 87 L.Ed. 626 (1943). For example, counsel for the defendant/intervenor proprietary handlers at page 47 of his brief refers to the phenomenon of "intermarket subsidization". However, the Secretary in his decision makes no reference to the existence of this phenomenon as a basis for his ruling. Thus, even though the administrative record may support a finding that such a problem exists, which we do not believe it does, it is not relevant to our review of the agency's action.

ed handlers in the expansion area by reason of the fact that they are federally regulated, does the Secretary have the authority to include the expansion area within the federal orders so as to eliminate the alleged competitive advantage of certain non-federally regulated handlers.

## III. THE OPPONENT'S CHALLENGE

 The plaintiffs argue that the Secretary's Findings are not supported by substantial evidence and that his decision is arbitrary and capricious. Thus, we are required to carefully review the extensive administrative record upon which the Secretary relied to determine whether his factual findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion", i.e., substantial evidence. *Suntex Dairy v. Block,* 666 F.2d at 162, *quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938). *See also, Jones v. Bergland,* 456 F.Supp. 635 (E.D.Pa.1978). The decision of the Secretary may be invalidated on the grounds that it is arbitrary and capricious only if we can find "no rational connection between the facts found and the choice made". *Sargent v. Block,* 576 F.Supp. 882, 892 (D.C.D.C.1983). We may only examine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment". *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136, 153 (1971).

We begin our analysis with a presumption that the Secretary's action is valid and, therefore, the burden is upon those who challenge the agency's action to prove the invalidity of that action. Further, we must accord great deference to the Secretary's interpretation of the AMAA and his authority thereunder, particularly in light of the statutory and regulatory scheme's extremely complicated structure. With these principles in mind, we now address the plaintiff's specific challenges to the Secretary's decision.

### 1. *The burden of excess milk*

Two of the Secretary's Findings as delineated above involved the claim of the proponents of area expansion that Federal order producers carry the burden of the reserve supplies associated with the expansion area, thereby deteriorating the federal order blend prices. This problem primarily involved Order 4. The Secretary first found that API, the dominant distributor of fluid milk in the expansion area, at certain times shifted non-Federal order producers and/or milk associated with API's Schuylkill Haven plant to its plant in Allentown, which is an Order 4 reserve processing facility. If such is the case and assuming the milk so shifted would be pooled on Order 4, API would thereby theoretically lower the Order 4 blend price since this milk would be treated as Class II milk. At the same time, API would maintain its high Class I utilization at its Schuylkill Haven plant. The proponents of area expansion argued that this created a gross inequity which harmed Order 4 producers.

Two witnesses presented testimony on this issue, James Fraher, an economist employed by Interstate Milk Producers Cooperative, a member of Pennmarva, and George O'Brien, an economist who testified on behalf of the Dairylea Cooperative, a member of API. Based on the testimony of these two men, the Secretary concluded as follows:

The record evidence also indicates that *some* of the reserve milk supplies associated with the Schuylkill Haven plant's fluid sales in the (20)–county area is (sic) carried by Order 4 producers. Pennmarva's witness (Fraher) testified that although Order 4 producers are not sharing in the Schuylkill Haven plant's Class I sales *a large portion of the reserve milk supply [i.e., excess milk] associated with those sales in the (20)–county area is pooled as producer milk on the Middle Atlantic market through API's Allentown pool manufacturing plant. The pooling of this excess milk on the Middle Atlantic market lowers the uni-*

form prices to those Order 4 producers who regularly supply the market because API accounts to the pool for this milk at the order's lower valued Class II price (which averaged $12.51 in 1982) and receives the higher valued uniform base price ($13.81 in 1982) for 50 percent or more of this milk and the uniform excess price ($12.37 in 1982) for the remainder of the milk. Thus, API retains for itself the sales of the higher valued Class I milk sold in the (20)–county area from its Schuylkill Haven plant and causes Order 4 producers to subsidize its excess milk supplies by pooling such milk on this market.

API's witness did not refute the above described testimony of Pennmarva's witness. The witness agreed that if a nonfederal order producer delivering to the Schuylkill Haven plant had some milk delivered to API's Allentown plant such milk would be considered producer milk under Order 4. *Although he thought that most of the reserve milk API might move to Allentown from Schuylkill Haven would be producer milk under Order 2, he was not certain how Lehigh Valley Farmers handled their excess milk that was associated with the Schuylkill Haven plant.*

50 Fed.Reg. 32721 (1985). (Emphasis added).

■ Examining the testimony of these two men, we fail to see how the Secretary could have concluded that even some of the reserves associated with API's Schuylkill Haven plant's fluid sales in the expansion area are carried by Order 4 producers. Further, it is unclear exactly what finding the Secretary intended to convey. While he states the record evidence shows that "some" of such reserve supplies are carried by Order 4, he refers at length to Fraher's testimony that a "large portion" of such excess milk is pooled on Order 4 and goes on to state that API's witness, O'Brien, failed to refute this testimony. This creates two problems. First, since the Secretary has failed to somehow "quantify" the term "some", it becomes impossible for this Court to determine that the Secretary's

conclusion is supported by substantial evidence. Second, it is impossible for us to determine whether the Secretary's decision, with regard to this Finding, may be arbitrary and capricious since we cannot determine whether such "dumping" of excess milk on Order 4 is a factor relevant to the Secretary's decision. If the amount of such milk is so minute that it has no affect on the Order 4 blend price, then this Finding would be irrelevant. However, even though the Secretary by the manner in which he has stated this Finding has created serious questions regarding the availability of effective judicial review, *Saylor v. U.S. Department of Agriculture, supra,* we will assume that the Secretary concluded that such quantities of milk were involved as would erode the Order 4 blend price, and we, therefore, also assume that this Finding was relevant to his decision. Even making these assumptions in favor of and in support of the Secretary's Conclusion, we find that the Secretary's Conclusion is not supported by substantial evidence.

Fraher made his initial allegation that such shifting occurred during his direct testimony, *i.e.,* his statement in support of expansion of the federal orders. Fraher stated that:

The large disparity in Class I utilizations between PMMB (Pennsylvania Milk Marketing Board) Areas 2 and 3 (the expansion area) and the adjoining Order 4 market indicates that the necessary reserve supply for a large Order 4 producers through marketing practices by Order 4 cooperatives, (sic) Inter-State Milk Producers Cooperative supplies a portion of the Class I needs of some Federally unregulated buyers located in "the Area" from the Federal Order 4 portion of its supply when such handlers need milk. *In addition, virtually all of the Class II purchases by a handler, operating a Schuylkill Haven, Pennsylvania plant in "the Area" with substantial volumes of Federal unregulated milk, are pooled under Order 4 at*

*an Order 4 reserve processing plant located in Allentown, Pennsylvania.*

(See Administrative Record [A.R.] p. 154) (Emphasis added).[6]

Fraher provided no specifics, however, to support his general assertions. Further, upon cross-examination, Fraher agreed that if a non-federal order handler does *not* dispose of his excess producer milk to federal order plants or purchases any spot loads or needed supplies for his operation from federal order plants, the federal order is *not* carrying any of the necessary reserves associated with that non-federal order handler. (See A.R., pp. 1430–33).

O'Brien, on the other hand and contrary to the Secretary's statement, refuted Fraher's claim that API moved *large quantities* of non-federally regulated milk from Schuylkill Haven to Allentown. The following is illustrative of O'Brien's testimony:

Q. With respect to again the API operation at Schuylkill Haven, when the milk of Lehigh Farmers Association is in excess of the needs of the Schuylkill Haven Plant where does that milk move and where is it processed?

A. I believe it goes to Allentown.

Q. Is that moved on a plant basis, is that a plant movement basis or is that a producer movement basis?

A. No, *it would be like a diversion of Order 2 Bulk Tank milk ...*

Q. But suppose some of these non order producers' milk ended up at the Lehigh plant—or at the API plant at Allentown, how would that be treated under Federal Order 4?

A. I'd have to go back and study my pooling provision to determine whether it's pooled or not. I hesitate to answer that question because I'd have to review the Order to be sure, whether it be (sic) pooled or not ... *I'm sure they attempt to*

*keep the milk associated with that facility clear from involvement with another federal order. So that it can continue to be utilized fully at the Schuylkill Haven plant.*

Q. Now your question, your response to my question is only regarding the treatment of milk associated with the API plant at Schuylkill Haven that is Federal Order 2 milk. Is that right?

A. Yes ... I'm inclined to think perhaps if a non Order producer delivered to that location he may be pooled under Federal Order Number 4. I'm not one hundred percent clear on that. I think that's why they attempt to do their balancing with Order 2 milk so it stays pooled under Order 2.

(A.R., 3503–3506). (Emphasis added). O'Brien also testified as follows:

Q. ... In other words, there would be no situation where milk that is PMMB regulated, if you will non-federally regulated milk, being shipped to Allentown as surplus milk of the Schuylkill Haven plant?

A. Yes, the attempt has been to keep the non federal milk and the federal milk fairly constant on a year round basis as far as producers are concerned. *As I understand it there is no classic pool riding, unquote, as a result of this operation ...*

(A.R., 3359–3360). (Emphasis added).

Q. Is it your testimony that no milk from Schuylkill Haven which is unregulated and unpriced under federal order ever goes to Allentown?

A. *I did not say that. But to the extent that that does happen it is very minute, a very small quantity, because as you can understand if a producer who is a non—not a producer under any other federal order, is delivered to an Order 4 plant it is treated as a producer*

---

**6.** Fraher in his testimony excerpted above refers to the possibility that non-federal order handlers might maintain their high Class I utilizations by purchasing milk when they need it

from Order 4 producers. We can discern no instance in which the Secretary relied upon this assertion in support of his decision.

*... it ends up in a loss to the organization and therefore that quantity of milk is kept to almost zero if possible in order to avoid losses of that type ... The result of that is that it does not end up with any of the nonorder milk being delivered onto or taken off of the federal order market. It is the other way around, if anything ...*

(A.R., 3807). (Emphasis added).

Q. ... in response to previous questions, particularly mine of yesterday, I think you did indicate with some of the nonorder producers, and it was your belief that they were associated with the Schuylkill Haven plant, is that correct—

A. I believe they all are.

Q. —that when that milk is not needed it does move to the Allentown plant of API, is that correct?

A. I got more clarification this morning on that, and *the milk for the most part does not go to Allentown. I think I indicated that when and if it does it is an almost minute quantity,* and therefore because of the difficulty associate—associated with the base excess plan in going into that market (Order 4) it becomes a costly proposition and therefore that type of move is kept to a minimum.

(A.R., 3810–3811). (Emphasis added).

Based on the representative testimony excerpted above, we fail to find any relevant evidence to support the Secretary's conclusion that API shifts non-federal order milk to its Order 4 Allentown facility in such quantities as to have a detrimental impact upon the Order 4 blend price. O'Brien, in fact, described a deliberate practice on API's part of avoiding such shifting with non-order milk. It is indeed true that O'Brien, upon reflection, agreed that *"if* a nonfederal producer delivering to the Schuylkill Haven plant had some milk delivered to API's Allentown plant such milk would be considered producer milk under Order 4", 50 Fed.Reg. 32721 (1985) (emphasis added). It does not follow from this, however, that O'Brien agreed with or failed to refute Fraher's assertion that such shifting occurred in large quantities. The record is in fact devoid of any evidence indicating in what quantities in terms of, *e.g.,* gallonage or hundredweight (cwt), such shifting occurred, if it occurred at all. Further, as stated by the Secretary himself, O'Brien "was not certain how Lehigh Valley Farms handled their excess milk that was associated with the Schuylkill Haven plant". *Id.* We, therefore, conclude that this Finding of the Secretary is not supported by substantial evidence.[7]

Regarding the burden of excess milk, the Secretary also found that certain non-federally regulated handlers in the expansion area at certain times "laid off" producers to maintain their high Class I utilizations and that these producers then delivered their milk to federal order handlers, there-

---

7. During the course of the hearing held pursuant to the plaintiffs' request for a preliminary injunction, Rex Lothrop, presently an Assistant Marketing Administrator with Order 4, but at the time of the administrative proceedings an economist with Order 4, testified that a "study" was prepared in response to the apparent conflict in the testimony of Fraher and O'Brien. Lothrop stated that, while no exact numbers were communicated, he informed employees of the Department of Agriculture's Dairy Division who were responsible for drafting the recommended decision which ultimately became the decision of the Secretary that his study showed that such shifting did in fact occur. (See Notes of Testimony of Hearing on Preliminary Injunction, November 22, 1985, pp. 63–72, and Deposition of Calvin Cobb, pp. 87–92, 110.) Based on this testimony and the revelations which developed pursuant to the ensuing discovery, the plaintiffs argue that the Secretary improperly relied upon extra-record evidence to resolve what he perceived to be "contradictory" testimony. *See* APA, 5 U.S.C. § 556(e) and AMAA, 7 U.S.C. § 608c(4). Because we have found the relevant Finding of the Secretary to be unsupported by substantial record evidence, we need not and do not reach the issues created by the Secretary's alleged reliance upon extra-record evidence. *See Air Products & Chemicals, Inc. v. F.E.R.C.,* 650 F.2d 687 (5th Cir.1981) and *Sea Coast Anti-Pollution League v. Castle,* 572 F.2d 872 (1st Cir.1978) and cases cited therein.

by increasing the milk pooled on the federal orders. As stated by the Secretary,

The PMMB regulated dealers in the (20)–county area pay their producers on the basis of individual handler returns. Individual-handler pooling generally results in much higher blend prices being paid to producers that (sic) the Federal order marketwide pool blend prices. Under individual-handler pooling, procurement advantages accrue to the individual handler who maintains a relatively high blended return to producers. As a consequence, it gives such a handler the ability to select producers on the basis of minimizing procurement costs. If such an individual handler accumulates more than an average proportion of surplus milk the handler is under competitive pressure to reduce its purchases of milk from producers. The record evidence indicates that in the past when such conditions prevailed some of the non-federally regulated handlers in the (20)–county area have ceased receiving milk from some dairy farmers. *Although it is not clear on the record where these dairy farmers now deliver their milk* it was indicated that *some* of them now deliver milk to Federal order handlers. Thus, this is another exmaple of Federal order producers carrying the burden of the reserve supplies for these local dealers.

The local Pennsylvania group excepted to the following findings: 'Guers' producers and other independent producers unfairly dump surplus on the federal order pools'. Exceptors claim that 'all evidence established that Guers, Farmers Cooperative and Valley Farms and their producers handle their own surplus through supply management and non-pool disposition'. We disagree with this exception because the decision does not suggest that these PMMB regulated dealers or their producers 'dump surplus on the federal order pools'. The record evidence does indicate, however, that in the past *some* of the nonfederally regulated handlers in the (20)–county area have stopped receiving milk from some dairy farmers. When this happened, in *most* cases the dairy farmers involved delivered their milk to Federal order handlers. In view of this, the decision concludes that this is another example of Federal order producers carrying the burden of the reserve milk supplies for these local dealers. Accordingly, the exception is denied.

50 Fed.Reg. 32721–32722 (1985).[8] (Emphasis added).

We find this conclusion to also be unsupported by substantial evidence. The only "evidence" that such shifting occurred came, once again, during the testimony of James Fraher. The following excerpts illustrate his claim:

Q. Well, I am not sure I understand how the fact that the handlers may have some overlapping sales area leads you to the conclusion that the reserve for the nonfederally regulated handlers is pooled and priced under Order 4. That is a question. I mean, how does that follow?

A. Well, that is a general question and I will attempt a general answer. Handlers selling fluid milk have Class 2 reserve needs or rather in order to supply a fluid market there are less reserves of milk associated with fluid sales. The fact that handlers, federally unregulated handlers in the PMMB areas, have Class 2 utilizations and that the PMMB re-

---

**8.** We find this passage highly illustrative of the problems created by the record before us. In his initial decision, the Secretary stated that the record evidence indicated that "some" of these laid off farmers shipped their milk to Federal order handlers. In his response to the filing of exceptions to this Finding, however, the Secretary states that "most" of these laid off farmers shipped to Federal order handlers. There is no explanation for this revision of his Finding and we are thus once again forced to resolve an internal inconsistency in the Secretary's decision. Also, once again, the record is devoid of any evidence which quantifies the number of these laid off farmers, if any, who began shipping to Federal order handlers or the amount of milk (gallons, cwt., etc.) which became pooled on any Federal orders as a result of this alleged practice.

quirements in the area have significantly below the federal order markets when both the handlers are in competition and the producers are situated in this same geographic areas (sic) would indicate that the Order 4, in this case, producers may be carrying, and Penn Marva (sic) feels are carrying, some of the reserve supply, then there are more specific factors that I mentioned, such as supplying some of the Class I needs of the dealers and—

Q. Well, you would agree with me, would you not, Mr. Fraher, if a non-federally regulated handler does not dispose of his excess producer milk, surplus producer milk, to federal order plants, and he does not buy any spot loads or needed supplies for his operation from federal order pool plants that the federal order is not carrying any of the reserves associated with those Class I sales. You would agree with that, wouldn't you?

A. Yes, with a qualification. There may be an additional factor, and that is what continuity there is between the producers supplying a federally unregulated handler over time. There may be if the handler has too much milk he may not deliver it to order plants. He may simply cease to continue to receive the milk of producers, and those producers may then become associated with another market.

Q. But if they do become associated with another market that market is not—you are not saying that those producers are some part of the necessary surplus for that handler, are you? It is not part of the necessary surplus, is it?

A. No, but the handler had too much milk and their milk now moves from market, PMMB market, to another market and the high utilization in the PMMB market tends to be main-tained while this milk is absorbed into the federal order market ...

(A.R., 1432–1434).

Q. Now, would I be correct in assuming, Mr. Fraher, that the most important—in fact, the only really significant amount of milk that you are aware of being pooled under Order 4, which relates to Class 1 supplies in this currently unregulated area, is in the second item you mentioned, that is, the Class 2 poolings at Allentown which may relate to the Class 1 supplies at Schuylkill Haven?

A. Yes. Except that over time, by selectively dropping producers if they had producer milk in excess of their fluid needs federally unregulated dealers *may have caused* to become pooled on Order 4 *substantial volumes* of milk that were previously associated with federally unregulated dealers.

Q. I take it by that you mean if producers who do not have a market to an unregulated—state regulated handler—obtain a market through Penn Marva (sic) Cooperatives or any other Order 4 handler and therefore become pooled under Order 4 that, therefore, they are part of the market.

A. I am thinking of a more specific situation, Mr. Beshore, where producers would have been historically associated with a federally unregulated dealer, and those producers might, for example, increase their sales or some combination of increased production by those producers and declining sales by the dealers would have caused the unregulated dealer to have milk in excess of his fluid needs that he did not care to move off the market to balance his supply. At that point he might decide that he didn't require the milk of all producers and let them know that, in which case they *might* become pooled on one of the adjoining markets.

Q. Well, let me ask you this. Are you aware, Mr. Fraher, of Guer's Dairy at Pottsville having any transactions of that nature?

A. No. I am not specifically aware of any related to Guer's.

Q. Are you aware of any producers of that nature coming on to Order 4 from affiliation with Freeman's Dairy in Allentown? To be cut off by Freeman's and coming on to the Order 4 pool?

A. I am not specifically aware of any connected with Freeman's.

Q. Are you aware of any being cut off by the Farmer's Cooperative Dairy at Hazleton and coming onto the Order 4 pool?

A. I believe some farmers sometime in the not too distant past, and my knowledge is really not complete, were laid off by Farmer's, *but as to where those farmers found a market, I do not know.*

Q. Are you aware of any farmers associated with the fluid supply at the Valley Farms plant in Williamsport losing that market or being cut off from that market and coming onto the Order 4 pool?

A. *No. And I am generally not aware of the movements of producers from federally unregulated handlers to other markets, to make a general statement.*

Q. There has been, to your knowledge, there has been very, very little movement of that nature. Isn't that correct.

A. I think Clover Farms in Reading has laid some farmers off in the not too distant past. There may be others. Dallas Dairies ceased operation, and I think they were being supplied by an independent or a non-order producer group of farmers, *but I just do not have detailed specific knowledge.*

Q. You don't have any specific information to suggest that any producers associated with the Dallas Dairy would not be pooled on Order 4, do you?

A. *No, I don't. I am just raising the possibility.*

(A.R., 1439–1443). (Emphasis added).

This is the only "evidence" introduced on this issue. As can be seen, Fraher had no specific knowledge that such shifting had ever occurred, he provided no specific quantities, and he readily admitted that he was "generally not aware of the movements of producers from federally unregulated handlers to federal order markets ..." (A.R., 1443). We fail to comprehend how the Secretary reached the conclusion which he did based on this record. Perhaps more importantly, the Secretary in his own decision admitted "it is not clear on the record where these dairy farmers now deliver their milk ..." 50 Fed.Reg. 32721 (1985). Thus, we must find that this aspect of the decision is also not supported by the requisite substantial evidence.[9]

**9.** Perhaps recognizing the failure of the record to support the Secretary's decision that Federal order producers carry the burden of excess milk associated with the expansion area, counsel for the government and the defendant/intervenor proprietary handlers now argue that these Findings were only secondary to the Secretary's decision and even if unsupported by substantial evidence constitute only harmless error. (See Brief of USDA, p. 13, and Brief of defendant/intervenor proprietary handlers, p. 59, fn. 12). However, no where in his decision does the Secretary explicitly or implicitly distinguish between primary and secondary considerations. To the contrary, we can only conclude that this aspect of the Secretary's decision is equally important as the others. Further, to decide that the Secretary would implement the same regulations without these Findings would require us to substitute our own judgment for that of the Secretary, which is, of course, prohibited. Counsel for the USDA has cited us to no authority, other than his own *post hoc* rationalizations, that the Secretary would still act as he did. Thus, even assuming the Secretary's remaining Findings are supported by substantial evidence, which we do not believe they are, we would be required to remand this matter to the Secretary for further consideration based on our conclusion that there is no evidence in the record to support a finding that federal order handlers carry the burden of reserve supplies associated

### 2. *The competitive advantage of API and others*

The secretary has also concluded that area expansion is necessary to eliminate the competitive advantage allegedly possessed by certain non-federally regulated handlers, particularly API, who are not required to make equalization payments into any Federal order pool or to pay PMMB minimum producer prices. The Secretary's Finding in this regard requires a detailed analysis of the workings of the Federal orders and the state regulations imposed upon the non-federally regulated (PMMB regulated) handlers distributing milk in the expansion area.

As stated earlier, Federal order handlers are required to pay the producers shipping milk to them a "blend" price based upon the marketwide utilization of milk within each order. A handler with a high Class I utilization would be required to pay into the order's "equalization pool" approximately the difference between the blend price and the Class I price multiplied by his total usage of milk (frequently expressed in terms of hundredweights [cwt]). A handler with a high Class II utilization would, on the other hand, receive a payment from the equalization pool since the price set for Class II milk would be below the blend price it was required to pay to the producers from which it purchased milk.

A similar, though by no means identical, system exists in the expansion area. This system as indicated earlier is administered by the Pennsylvania Milk Marketing Board (PMMB), an agency of the State of Pennsylvania. The PMMB establishes minimum Class I and II prices which handlers must pay to producers. The PMMB establishes no "blend price", however, and thus, farmers shipping to PMMB regulated handlers are paid either the Class I or Class II price. Likewise, there is no "equalization pool"

under PMMB regulations as exists in the Federal orders. However, those PMMB regulated handlers which also function as cooperatives, *e.g.*, API, may "reblend" their prices, which allows a handler/cooperative with a high Class I utilization to pay its producers less than the PMMB Class I price. The proponents of area expansion claim that the ability of such cooperatives, particularly API, to reblend their prices inures to their competitive advantage over Federal handlers, the so-called "war chest" theory. The record shows that this phenomenon allows API to retain approximately $2.3 million per year which would otherwise have to be: (1) distributed to its member cooperatives/producers, assuming such is not done now, if it could not reblend under PMMB regulations or (2) paid into a Federal order equalization pool if, *e.g.*, API's Schuylkill Haven plant were federally regulated.[10] As stated by the Secretary,

> It is true that PMMB Class I prices are about the same or only slightly lower than the Federal order prices throughout this territory. However, as set forth previously, a basic problem described on this record is that the dominant distributor (API) of fluid milk throughout the (20)–county area is not obligated to either the PMMB or Federal order to pay Class I prices on such sales.... The record evidence also suggests that the majority of nonfederal order producers in the area are still paid on the basis of Federal order uniform producer blend prices. In this regard, of the estimated 550 to 700 nonfederal order producers in the (20)–county area over 500 of them belong to cooperative associations which reblend their proceeds and pay member producers a price based either on the Order 4 uniform base and excess prices or the Order 2 blend price. Thus, even though the PMMB Class I prices are not substantially below the Federal order prices

with the sale of fluid milk in the expansion area.

**10.** Federal order handlers/cooperatives may similarly reblend their prices. However, they must still make the same payment into the order's equalization pool as a proprietary handler

must. Thus, for such handler/cooperatives to gain an advantage akin to that allegedly possessed by API, they would have to pay their member producers less than the Federal order blend price.

the Federal order blend prices are still used as the basis for paying the vast majority of producers in the area. 50 Fed.Reg. 32722 (1985). In simpler terms, the system provides, *e.g.*, API with a raw product cost advantage.[11] This raw product cost advantage is transformed into an additional $2.3 million per year profit to, *e.g.*, API which API would not realize were its Class I sales totally federally regulated.

The question now becomes, how does API utilize this "extra profit"? Interestingly, the Secretary, in his decision, nowhere explicitly answers this question. However, as stated by counsel for the defendant/intervenor proprietary handlers, this profit may be utilized in two ways: (1) it can be returned to producers as patronage dividends or equity or (2) it can be used to subsidize competition with local proprietary handlers and federally regulated handlers. (See Brief of defendant/intervenor proprietary handlers, p. 32). Since we are here concerned with API's alleged competitive advantage, we need only examine this second possibility. If API or the other non-federally regulated handler/cooperatives in the expansion area simply return this extra profit to their member producers, API or the other handler/cooperatives could not, of course, be subsidizing their sales of fluid milk so as to undercut the prices of federally regulated handlers and thereby prevent them from piercing the market in the expansion area.

There is in fact no evidence in the record that API subsidizes its sales in the manner described above. There is also no evidence that API or others use this money for advertising which would somehow place the federally regulated handlers at a competitive disadvantage or provide API with any other unfair advantage. Under cross-examination, the experts testifying on behalf of the proponents of Federal order expansion could not point to a single instance of "predatory pricing", nor could they provide specific examples of Class I sales lost by Federal order handlers to non-federally regulated handlers because of this alleged competitive advantage. (See A.R., 1443–44, 1739–40, 1734–35 and 2087). Rather, the Secretary concluded that based upon API's 150% increase in distribution between 1973 and 1982, API "must" possess some advantage over federally-regulated handlers. As stated by the Secretary,

It must be concluded that this 150 percent increase in distribution is attributable, in large measure, to the fact that the Schuylkill Haven operation over a period of years has had a raw product cost advantage over other regulated handlers of as much as $1.50 per hundredweight on a large portion of its fluid milk sales.

50 Fed.Reg. 32721. The Secretary provides no explanation, however, why such a conclusion "must" be inferred from API's growth. Further, as stated earlier, we dis-

---

**11.** We note the commercial fact that API since the commencement of these actions has sold its processing and manufacturing facilities, including the Schuylkill Haven plant, to a subsidiary of Johanna Farms, Inc., an independent, privately owned proprietary handler. API thus no longer functions as a handler; however, it continues to exist as a federation of cooperatives. It would thus appear that one of the Secretary's primary concerns, *i.e.*, the claimed competitive advantage of API, has been eliminated since Johanna Farms will be required to pay to API's member cooperatives/producers the PMMB minimum Class I prices because as a proprietary handler Johanna Farms will not be able to "reblend".

Counsel for the plaintiffs in Civil Action 84–6484 argues that in light of this development this Court is required to remand this matter to the Secretary for further consideration based on a change in "core" circumstances which goes "to the very heart of the case". *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 283 (D.D. Cir.1971), *cert. denied sub nom. WHDH, Inc. v. FCC,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972) *see also, Cleveland Television Corp. v. FCC,* 732 F.2d 962, 973, fn. 13 (D.C.Cir.1984); *Air Products & Chemicals, Inc. v. F.E.R.C.,* 650 F.2d 687, 704 (5th Cir.1981); *American Optometric Association v. F.T.C.,* 626 F.2d 896, 906 (D.C.Cir.1980); and *Frontier Airlines, Inc. v. C.A.B.,* 602 F.2d 375 (D.C.Cir.1979). We find some merit in plaintiff's argument; however, we need not and do not reach this issue based on our conclusion that the Secretary's Finding that Federal order handlers operate under a competitive disadvantage when distributing fluid milk in the expansion area is unsupported by substantial evidence.

cern no record evidence that API's "competitive advantage" actually prevented any federally regulated handlers from competing for the sale of fluid milk in the expansion area. The conceptual, theoretical and/or hypothetical does not constitute substantial evidence. The Secretary presumes that API fails to return all or some of its "extra profit" to its member producers. However, there is no record evidence to support a finding that API or any other handler/cooperative does or does not distribute one hundred percent of the full value of its Class I sales in the expansion area to its members. It may indeed be true that API retains the entire $2.3 million per year to subsidize its sales.[12] Such is not established on the record, however, and, therefore, we find and conclude that the Secretary's Finding that API or any other handlers/cooperatives in the expansion area which are not federally regulated possess a competitive advantage over federally regulated handlers is not supported by substantial evidence.[13]

### 3. *The integration of markets.*

Counsel for the USDA argues that the most important of the Secretary's Findings was that the Class I sales in the expansion area have become an "integral" part of Orders 2 and 4. Here, the Secretary's Finding was as follows:

> All of the territory within the (20)– county area should be included under

Federal regulation. The record evidence indicates that ... substantial volumes of milk are distributed throughout the (20)– county area from plants regulated by either Orders 2 or 4.

Data for 1982 indicate(s) that 151.7 million pounds of packaged milk were distributed in PMMB Area 2. Of this total, nearly 81 million pounds (53 percent of the total) were distributed by 17 plants regulated under one of the two orders. Five of these plants were regulated under Order 2, with fluid milk sales in 1982 of nearly 47 million pounds (31 percent of the total), and 12 were regulated under Order 4, with fluid milk sales in 1982 of about 34 million pounds (22 percent). The four plants located in PMMB Area 2, Clover Farms, Freeman's, Longacre's, and Stocker Brothers, had fluid milk sales of nearly 70 million pounds (46 percent).

There were 311.5 million pounds of packaged milk distributed during 1982 in PMMB Area 3. Of this total, about 207 million pounds (66 percent of the total) were distributed by eleven plants regulated under the two orders. Five of these plants were regulated under Order 2 with fluid milk sales of 168.5 million pounds in 1982 (54 percent of the total), and six were regulated under Order 4, with fluid milk sales of nearly 39 million pounds in 1982 (12 percent). However,

---

**12.** PMMB regulations establish a floor resale price for fluid milk which handlers (Federally and non-federally regulated) may not sell below when distributing fluid milk to retail outlets. The Secretary in his decision stated that such resale prices are not taken into consideration, except as such prices may relate to the orderly marketing of milk. See 50 Fed.Reg. 32724 (1985). While not explicitly stated, we infer that in this case the Secretary considered PMMB minimum resale prices as irrelevant to his decision. If such is the case, we question whether the Secretary's decision in this regard was not arbitrary and capricious although we need not and do not make any such finding.

Testimony presented during the administrative hearing indicated that handlers have historically resold their milk at the PMMB minimum resale price. Assuming such is true, it would be impossible for API to engage in any predatory pricing in the expansion area since it could

charge no less for its milk than it was already charging. This fact, if true, would directly impact upon the Secretary's conclusion that API possesses a competitive advantage over federally-regulated handlers. Since we find this conclusion to be unsupported by substantial evidence however, we do not reach this issue.

**13.** API in its Brief argues that its growth can be attributed to any number of other factors unrelated to any alleged competitive advantage. As recognized by the Secretary in his decision, API merged with another cooperative, Dairylea. Counsel for API states that more than half of API's increased output can be attributed to this merger, a factor totally unrelated to any competitive advantage it allegedly possesses. (Brief of API, p. 84). Counsel for API also states that the record evidence indicates that Order 2 plants from 1973 to 1982 have similarly experienced great growth. (Id.)

the record does not indicate the extent of fluid milk sales in PMMB Area 3 by the dealers located therein, except for the sale of Dutch Valley and API Schuylkill Haven.

The above data demonstrates the extensive distribution of fluid milk sales in the (20)–county area by plants regulated under the two orders. However, the total fluid milk distribution of 215.5 million pounds by Order 2 plants (47 million in PMMB Area 2 and 168.5 million in PMMB Area 3) is not all priced under the order. Data presented by the New York-New Jersey market administrator's office indicated that approximately *88 percent* of this distribution comprised "unpriced milk' (*i.e.*, milk that is not subject to the minimum Class price provision of the order). Thus, even though Order 2 regulated plants distributed 215.5 million pounds in the 23–county area during 1982, *probably only 26 million pounds were actually priced under the order.*

50 Fed.Reg. 32720 (1985). (Emphasis added). From this data, the Secretary concluded that the expansion area constituted a common area of distribution as between handlers fully regulated under Orders 2 and 4 and the non-federally regulated (PMMB regulated) handlers in the expansion area and the "partially federally regulated" handler (API) which utilizes Order 2's "pass-through provisions" to distribute milk in the expansion area which is not priced under Order 2.[14]

Counsel for the plaintiffs argue that no inference of substantial competition between these entities may be drawn from the data relied upon by the Secretary. We agree. Here, we must once again return to the AMAA to examine its purpose. As stated earlier, the purpose of the Act was to eliminate competition amoung producers of certain commodities. With regard to

milk, the specific purpose of the AMAA was to eliminate the competition among producers for the sale of their milk to handlers who would utilize the milk for fluid purposes. By forcing handlers to pay producers uniform prices regardless of how the milk was utilized, Congress sought to insure "orderly markets". A "disorderly market" would exist where handlers in "substantial competition" in a common market place could pay their producers non-uniform prices since producers would naturally attempt to sell their milk to the handler paying the higher price. We can find no record evidence, however, that producers in the expansion area are competing to sell their milk to non-federally regulated handlers or that there is any other type of "crippling price warfare". *See Zuber v. Allen*, 396 U.S. 168, 181, 90 S.Ct. 314, 321, 24 L.Ed.2d 345, 353 (1969); *Smyser v. Block, supra;* and *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308 (3d Cir.1968).

We also find a lack of record evidence that Orders 2 and 4 handlers and non-federally regulated handlers (including API as far as its "unpriced milk" is concerned) are in substantial competition with one another for the sale of milk in the expansion area. In fact, no where in the Secretary's entire decision is there an explicit finding that such competition exists. Rather, the Secretary simply found that there is extensive distribution of fluid milk in the expansion area by handlers regulated under Orders 2 and 4. By analyzing the market in this manner, however, the Secretary has in essence treated API, the dominant distributor in the expansion area, as competing with itself. If, as argued by counsel for API, the amounts of milk distributed by API in the expansion area—milk which is not priced under Order 2—are subtracted from the figures set forth by the Secretary, it is clear that there is not an extensive distribution of milk in the expansion area by Or-

**14.** Order 2's "pass-through" provision allows certain qualified handlers regulated under the Order to process milk at its plant which is to be distributed outside the geographic boundaries of Order 2 so that such milk is not subject to the pricing provisions of the Order. API utilizes this provision so that the milk it distributes in

the expansion area is not priced under Order 2. This milk is still subject to PMMB regulations however. API's Schuylkill Haven plant, although located physically in the expansion area, is regulated to an extent under Order 2 because of its sales in the Order 2 area, primarily northern New Jersey.

ders 2 and 4 handlers who must pay their producers the minimum Order prices on those sales. Making these adjustments, the data shows only 5% of the milk distributed in PMMB Area 3, which is to be annexed to Order 2, is priced under Order 2. Similarly, if API's sales are removed from the Secretary's data as to PMMB Area 2, which is to be annexed to Order 4, the data shows that only 25% of the milk distributed in PMMB Area 3 is presently priced under Order 4, (See A.R., Exhibit 43, Table 2, and Brief of API, pp. 85–88).

Issues similar to this were presented to the Fourth Circuit Court of Appeals in *United States v. Mills, supra.* In that case, producers challenged an Order promulgated by the Secretary which would include counties on the Chesapeake Bay's Eastern and Western shores and the City of Baltimore within the same Order. The plaintiffs, producers in the Eastern and Western shore counties, challenged the Order on the grounds that they were not part of the Baltimore community, and therefore, should not be included in the Order. In reversing the district court and sustaining the Secretary's proposed Order, the Fourth Circuit stated it had been clearly established "That milk-wise the City and the counties have a community interest", and that the plaintiffs had failed to prove wrong the Secretary's conclusion that the prescribed area constituted a "practical homogeneous area of control, fairly encompassing the Baltimore milkshed". *United States v. Mills,* 315 F.2d at 835. The Court stated that:

> In 1959 in excess of 50% of the fluid milk dispensed on the Eastern Shore came from the City dairies. A subsequent investigation in 1961 showed that almost 80% of the total distribution on the Eastern Shore was furnished from Baltimore. Furthermore, a major part of the milk sold by producers on the Eastern Shore for fluid use was purchased by the Baltimore companies. As to the Western Shore counties, the Secretary found that there the greater part of the

fluid milk commerce was carried on by the Baltimore handlers.

*Id.*

In *Mills,* it was clear that the City of Baltimore and the adjoining counties constituted a common area of distribution and competition. The record before us does not support a similar conclusion. Therefore, we find and conclude that the Secretary's Finding that the Class I sales in the expansion area have become an integral part of the Middle Atlantic and New York-New Jersey markets is not supported by substantial evidence.

### 4. *Integration and competitive advantages as related to this case.*

In arguing that API or any other handler/cooperative possess some competitive advantage over Federally-regulated handlers, counsel for the government and the defendant/intervenors seek to distract and coax us away from the true issue in this case, *viz.,* whether the expansion area has become an integral part of the Order 2 and/or 4 markets. The alleged competitive advantage of API, standing alone, would not, based on the Secretary's own precedent, justify the expansion of the Federal Orders. As stated by the Secretary in 1975, any pricing disparity between Federal and State regulation "in itself, does not indicate that all non-federally regulated areas of Pennsylvania should be included in a Federal order." 40 Fed.Reg. 14704 (1975). Thus, until the question of integration is answered in the affirmative, the question of any such competitive advantage is irrelevant, and, having held that there is a lack of substantial evidence to support a conclusion that the expansion area has become an integral part of the Federal order markets, we need not in this context even address the issue of competitive advantages. The question of competitive advantages is relevant only to the question of whether the Secretary possesses the authority to eliminate any such competitive advantage by Federalizing the expansion area even where there is no integration of markets. The AMAA provides no guidance on this

issue. The Secretary's interpretation of the AMAA and his own regulations, based on the statement quoted above, establishes that the Secretary *does not* interpret the AMAA so as to vest such authority in him. However, we need not answer this question since we have concluded that the record before us contains no substantial evidence to support a conclusion that API or any other handler/cooperative possesses any such competitive advantage over any fully-regulated Federal order handlers.

### 5. *The Secretary's 1975 decision*

This is not the first time the proponents of area expansion have sought to enlarge the Federal orders so as to include at least some of the counties the Secretary presently proposes to annex to Orders 2 or 4. *See* 40 Fed.Reg. 14702 (1975). A similar attempt was made in approximately 1975 and, in fact, certain Pennsylvania counties were added to Order 4. The Secretary declined, however, to federalize the area presently at issue on the grounds that the record contained no evidence of any actual or potential disorderly marketing conditions which would warrant such expansion. The following excerpts from the Secretary's 1975 decision are illustrative of his Findings and Conclusions as to why such expansion was not warranted:

... notwithstanding such producer support, the record of the hearing upon which this decision is based does not support either a further extension of the Middle Atlantic marketing area at this time or an extension of the New York-New Jersey marketing area (so as to include Berks, Lehigh, Northampton or

the 20 Northeastern Pennsylvania counties within said areas) ...

 . . . . .

... actual volume of fluid milk sales lost by the MDAPA in this three-county area (Bucks, Chester and Montgomery) cannot be ascertained, nor can it be inferred that nonfederally regulated dealers increased their sales by any specific amount. However, evidence in the record indicates that sales by Order 4 handlers in nonfederally regulated areas of Pennsylvania declined by approximately 20 percent from October 1971 to October 1973. Obviously, sales declines of this magnitude must reflect, in large part, the pricing disparity between Federal and State regulation as hereinafter discussed. *This, in itself, does not indicate that all nonfederally regulated areas of Pennsylvania should be included in a Federal order. Bucks, Chester and Montgomery counties, however, have become an integral part of the distribution area of fully regulated handlers.*[15]

 . . . . .

... because of overlapping procurement and sales with Pennsylvania dealers immediately to the north *and lack of any positive showing of substantial competition between local dealers and regulated handlers*, proposals to extend the area (Order 4) to include Washington county have been denied in the past.[16]

 . . . . .

Berks, Lehigh and Northampton Counties, in PMMB area 2, should not be included in the Order 4 marketing area on the basis of this record. While non-

15. While the Secretary's 1975 decision is, of course, not before us for review, we note that his decision in 1975 contains many of the same problems as the decision that is before us. For example, in the passage quoted above, the Secretary states that the decline in sales by Order 4 handlers "must" reflect the pricing disparity between Federal and State regulation. He provides absolutely no explanation why this conclusion "must" be reached however. Similarly, in the decision before us, the Secretary provides absolutely no explanation why API's growth "must" reflect the raw product cost advantage possessed by API.

16. The Secretary based on the record before him in 1975 concluded that Washington County should be annexed to Order 4 since the annexation of Bucks, Chester and Montgomery Counties to Order 4 would result in fully regulated handlers becoming "essentially the exclusive suppliers" of milk in that county. We note this passage as illustrative of the factors the Secretary relies upon when defining marketing areas.

federally regulated dealers serving the three counties have essentially the same product cost advantage over Order 4 handlers as local dealers in the area hereinbefore recommended for inclusion in the marketing area, *there is no substantial evidence in this record on which to conclude that such counties are, or have ever been, a substantial part of the general sales area of currently regulated Order 4 handlers or handlers who will become fully regulated by virtue of the recommended Order 4 expansion to include other Pennsylvania territory.*

... fact that a few Order 4 pool plants and/or prospective pool plants have distribution in Berks county is not in itself a compelling reason for including such county in the Order 4 marketing area. Berks County presently is essentially a separate local market served *preponderantly* by local handlers and with insufficient ties with the marketing areas as recommended to be extended to justify its inclusion at this time.

... percentage of the local sales made by these handlers (two Order 4 and one Order 2) (in the Allentown-Bethlehem-Easton area) cannot be specifically determined on the record but seemingly is about *25%.*

While presently regulated handlers and dealers who will become regulated by the recommended area extension will continue to operate at a disadvantage in the Allentown-Bethlehem-Easton area in competition with nonregulated dealers, their total sales here are not a substantial part of their total business. The marketing area boundaries herein recommended for decision represent the maximum limits of extension which can rea-

sonably be achieved under the existing market situation on the basis of this record.

To the extent that (API's) Allentown manufacturing plant is handling (Order 4's) regular reserve supply, this is an accommodation to the market and not a burden. If, in fact, the milk at Allentown is not available for fluid use as needed by the market, this reflects a pooling problem and should not be confused with the problem of area extension.

Neither the Order 4 nor the Order 2 marketing area should· be extended to include any of the territory in PMMB Areas 3 and 5 or Monroe County in PMMB Area 2 (the expansion area). This large geographical area is basically rural and is *predominantly* supplied by a large number of nonfederally regulated plants located throughout the area. Neither Order 4 nor Order 2 regulated handlers are *substantially* involved in distributing fluid milk in the area.

Neither Order 4 nor Order 2 handlers are *substantially* engaged in the distribution of fluid milk in the 20–county area. To the contrary, the *preponderance* of sales are made by competing nonfederally regulated dealers. The two largest of such nonfederally regulated plants located in the area are operated by Lehigh Valley ... and Dairylea ...[17]

Clearly, the *preponderance* of sales in the northeastern area of Pennsylvania emanate from nonfederally regulated plants.

17. As noted earlier, Dairylea's Scranton plant was closed and its operations consolidated with those of the API federation at API's Schuylkill Haven plant.

We also note, as stated earlier, that API since 1975 has become "semantically" federally regu-

lated because of its sales in the Order 2 area. However, the milk API distributes in the expansion area is not priced under Order 2, as already explained, and, thus, as to this milk, API is not federally regulated and need only comply with the applicable PMMB regulations.

... *no indication* that sales of Order 2 handlers in 1973 (in northeastern Pennsylvania) were ever greater [7%], or that sales had been lost as a result of any competitive disadvantage.

. . . . .

... no compelling evidence of market disruption of a magnitude requiring Federal regulation at this time.

. . . . .

... extension of regulation to this area would not result in any perceptible improvement in returns to these dairy farmers and would not materially affect prices under the orders.

40 Fed.Reg. 14704–14710 (1975). (Emphasis added).

Many of the plaintiffs' arguments are addressed to their contention that marketing conditions in the expansion area have not changed, and in some ways have improved, since the Secretary's 1975 decision. However, as counsel for the defendant/intervenor proprietary handlers points out, there is nothing which prevents an agency such as the USDA from revisiting an old decision and acting where previously it had declined to act. It is also true that "all administrative agencies 'have an obligation to render consistent opinions and either follow, distinguish, or overrule their own precedent'," *N.L.R.B. v. Rhone-Poulenc, Inc.,* 789 F.2d 188, 193 (3d Cir.1986), *quoting Chisholm v. Defense Logistics Agency,* 656 F.2d 42, 47 (3d Cir.1981). Further, as stated earlier, we are limited by what the agency states as the basis for its action; we may not substitute our own judgment for that of the agency's officials.

The Secretary in this instance did not reexamine his 1975 decision and determine that it was wrong. Neither did he explicitly overrule precedent as to how he delineates the geographic boundaries of the marketing orders he prescribes. Rather, he found that, "On the basis of the current record the reasons given by the Assistant Secretary in his 1975 decision for not including under Federal regulation the (20)–county area no longer exist today". 50 Fed.Reg. 32722. The Secretary factually distinguished his prior decision from his present one and, thus, his Finding in this regard is subject to the same substantial evidence standard discussed earlier. For the reasons stated earlier, we find a lack of substantial evidence to support the Secretary's Finding that marketing conditions since 1975 have changed in such a manner as to create an actual or potential disorderly market.[18]

---

**18.** We are left with the troubling impression following our comparison of the 1975 and 1985 decisions that there has been an attempt to change the rules of the game, without explicitly telling the players, in order to reach a desired result. Here, we refer to the Secretary's apparent drift away from defining marketing areas strictly in terms of "substantial competition", as he did in 1975, towards an examination of factors such as "economic ties" or the total number of federally regulated handlers distributing in the expansion area, as opposed to the total gallons of milk those handlers distribute regardless of their actual number.

The Secretary's discretion under the AMAA is extensive since Congress has not explicitly defined the standards the Secretary must apply when drafting the geographic boundaries of marketing orders. Nevertheless, as stated earlier, an agency is still required to explain, overrule or distinguish prior precedent where it chooses to act in a manner differently than it had previously chosen. The requirement that a rational explanation of such a change in course be given presupposes that the explanation will be given on the record. As stated by the Third Circuit Court of Appeals,

'sharp changes of agency course constitute 'danger signals' to which a reviewing court must be alert.' (citation omitted.) A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhrered to.' (citation omitted.) 'A change in something from yesterday to today creates doubt. When the anticipated explanation is not given, doubt turns to disbelief.' An agency is, of course, free to change its position, but it must supply adequate data and a reasoned analysis to support this change.

*Natural Resources Defense Council v. U.S.E.P.A.,* 790 F.2d 289, 298 (3d Cir.1986).

## IV. THE REGULATORY FLEXIBILITY ACT.

The plaintiffs' final challenge to the proposed amendments to Orders 2 and 4 is that the Department of Agriculture failed to comply with the requirements of the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601–612. Section 603(a) of the RFA provides that:

> Whenever an agency is required by section 553 of this title, or any other law, to publish general notice of proposed rulemaking for any proposed rule, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis. Such analysis shall describe the impact of the proposed rule on small entities. The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule. The agency shall transmit a copy of the initial regulatory flexibility analysis to the Chief Counsel for Advocacy of the Small Business Administration.

5 U.S.C. § 603(a).

The RFA also provides, however, that:

> Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register, at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a succinct statement explaining the reasons for such certification, and provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

5 U.S.C. § 605(a).

■ The Secretary in this instance certified that his proposed rule amending Orders 2 and 4 in the manner already discussed would not have a significant economic impact on a substantial number of small entities. See 50 Fed.Reg. 32716 (1985). The plaintiffs argue that the Secretary's certification pursuant to § 605(a) of the RFA was wrong. We agree. The initial question, however, is whether the Secretary's certification is subject to judicial review.

Section 611 of the RFA provides as follows:

> (a) Except as otherwise provided in subsection (b), any determination by an agency concerning the applicability of any of the provisions of this chapter to any action of the agency shall not be subject to judicial review.

> (b) Any regulatory flexibility analysis prepared under sections 603 and 604 of this title and the compliance or noncompliance of the agency with the provisions of this chapter shall not be subject to review. When an action for judicial review is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

5 U.S.C. § 611. Based on Section 611, counsel for the USDA and the defendant/intervenors argue that the Secretary's certification is not subject to judicial review. There is scant case law on this issue outside of the Third Circuit and no guidance whatsoever within said Circuit. We rely upon our own analysis of the RFA and the persuasiveness of the reasoning of those courts which have addressed this issue.

Our research has divulged four cases in which other courts have addressed the meaning of Section 611. The District Court for the District of Columbia in *Sargent v. Block,* 576 F.Supp. 882 (D.D.C. 1983), concluded that it *could* under Section 611, review an agency's certification pursuant to Section 605(a). The Court found that the record supported the agency's determination that the proposed rule would

not have a significant impact upon a substantial number of small entities. It did not discuss its authority to conduct such an inquiry. In fact, the Court's review was unnecessary to its decision since it had already found that the plaintiffs lacked standing to challenge the Secretary's compliance with the RFA. 576 F.Supp. at 893. Thus, we draw little from the Court's decision.[19]

The District of Columbia Circuit Court of Appeals has addressed the ramifications of Section 611 on three occasions. *See Small Refineries Lead Phase-Down Task Force v. U.S.E.P.A.*, 705 F.2d 506 (D.C.Cir.1983); *Thompson v. Clark*, 741 F.2d 401 (D.C.Cir. 1984); and *Mid-Tex Electric Cooperative, Inc. v. F.E.R.C.*, 773 F.2d 327 (D.C.Cir. 1985). In *Small Refineries v. E.P.A.*, the Court held "that a reviewing court should consider the regulatory flexibility analysis as part of its overall judgment in determining whether a rule is reasonable and may, in an appropriate case, strike down a rule because of a defect in the flexibility analysis." 705 F.2d at 539. In that case, the EPA had prepared both an initial and final regulatory flexibility analysis. Therefore, the relevancy of the Court's analysis is diminished since that Court was presented with a somewhat different issue. However, the Court's discussion of the RFA's legislative history remains extremely enlightening. As stated by the Circuit Court, the RFA as initially conceived and drafted in S. 299, 96th Cong., 2d Sec., 126 Cong. Rec. S10, 930–91 (delay ed. Aug. 6, 1980), and as reported by the Senate Judiciary Committee, contained no restrictions on judicial review of agency compliance with the Act. The Senate rejected S. 299 and adopted a substitute bill offered by Senator Culver, who provided an extensive "analysis of the bill akin to a committee report." *Id.* at 538. The District of Columbia Circuit Court of Appeals provides a detailed discussion of Senator Culver's remarks, and we see no need to repeat them. It suffices to say that based on its analysis of the Senator's comments, the Court concluded that where a rule is challenged, the court should examine the *contents* of the flexibility analysis *where* one is undertaken as part of the entire administrative record.

The District of Columbia Circuit Court of Appeals was squarely faced with the issue before this Court in *Thompson v. Clark, supra*. The plaintiff in that case challenged the Department of the Interior's complete failure to conduct a flexibility analysis as well as the agency's failure to publish pursuant to Section 605 of the RFA a statement of reasons as to why such a study need not be prepared. The Court initially recognized the general presumption in favor of judicial review where substantial doubt about Congress's intent to preclude such review exists. The Court also recognized that the presumption is overcome where Congress's intent is "fairly discernible" in the detail of the legislative scheme or the legislative history. 741 F.2d at 404. The Court held, based upon the plain language of the statute, that there could be little doubt as to Congress's intent that an "agency's decision regarding when the agency shall conduct a regulatory flexibility analysis remains in the sole discretion of the agency." *Id.* at 406, *quoting* remarks of Senator Culver, 126 Cong.Rec. 21,460–61 (1980). The Court also went on to conduct an exhaustive review of the Act's legislative history, *i.e.*, Senator Culver's remarks, which it found supported the conclusion it had already reached. As cited by the Court, Senator Culver stated that:

Section 611(a) states that agency determinations concerning whether the provision of the bill apply to any action by the

---

**19.** The United States Court of International Trade in *Mast Industries, Inc. v. Regan*, 596 F.Supp. 1567 (C.I.T.1984), stated in dicta simply that "the compliance or non-compliance of agencies with the Regulatory Flexibility Act ... is specifically precluded from judicial review." *Id.* at 1573, fn. 9. This Court also offered no explanation for its conclusion.

agency—including a decision by the agency head to certify that a rule will not have a significant economic effect on small entities—shall not be subject to judicial review.... [I]t is clearly stated neither the regulatory flexibility analyses themselves (required by Sections 603 and 604) nor agency compliance or noncompliance with the provisions of this subchapter shall be subject to judicial review, either pursuant to this act, or section 706(2)(D) of this title, or any other provision of law.

. . . .

Section 611(b) provides that the *contents* of the regulatory flexibility analysis shall, to the extent relevant to an issue before the court, be available to and considered by a court when the court is determining the validity of the rule which is the subject of the analysis.

*Id.* at 406, *quoting* 126 Cong.Rec. 21,457 (1980) (Emphasis added). Senator Culver further opined that:

This means, for example, that the decision by an agency with respect to what proposed rules would have a significant economic impact on a substantial number of small entities pursuant to Section 605(b) shall not be subject to judicial review. *Thus, the decision regarding when the agency shall conduct a regulatory flexibility analysis remains in the sole discretion of the agency.*

*Id., quoting* 126 Cong.Rec. 21460–61 (1980) (Emphasis added.)

■ Based on the remarks of Senator Culver and the persuasiveness of the District of Columbia Circuit Court's reasoning in *Thompson v. Clark, supra,* we reach the same conclusion as did that Court.[20] An agency's certification pursuant to Section 605(b) of the RFA that a proposed rule will not have a significant economic impact on a substantial number of small entities is not subject to judicial review.[21]

## V. CONCLUSION

In reaching our determination of the multiple issues involved, we have had the benefit of oral argument by capable and competent counsel in connection with the entry of a preliminary injunction on November 22, 1985. Since that time, we have had the benefit of voluminous briefs submitted by counsel for the parties—the intervenors, the proposed intervenors, the plaintiffs and the government. Additionally, we have carefully reviewed and analyzed the administrative record consisting of more than 4000 pages and several hundred exhibits.

As the law requires, we have approached this issue with extreme deference to the Secretary's Findings and Conclusions and with full recognition of the limitations placed upon this Court in determining whether the Findings of the Secretary are supported by substantial evidence. While

---

**20.** This Court would be less than candid if it did not recognize the fact that at times Senator Culver appeared to contradict himself. At one point during his remarks, the Senator stated that:

If an agency ... completely and consciously ignores the ... requirement to perform regulatory flexibility analyses, an injured party would have grounds to argue that this fact is evidence of the unreasonableness of the rule....

126 Cong.Rec. S10,939 (daily ed., August 6, 1980). This statement appears to be directly opposed to his statement quoted above. Nevertheless, we believe his explicit statement that it is within the agency's sole discretion as to when

a flexibility analysis should be performed controls.

We would also be less than candid if we did not recognize that Congress theoretically rendered Sections 603 and 604 of the RFA nullities based on Sections 605 and 611. However, it is for Congress to correct this anomaly if it so desires.

**21.** We cannot explain the District of Columbia Circuit Court's failure in *Mid-Tex Electric Cooperative, Inc. v. F.E.R.C., supra,* to rely upon its earlier decision in *Thompson v. Clark, supra,* and to instead rely upon its finding that the plaintiffs lacked standing to challenge the agency's certification pursuant to Section 605(b).

the administrative record is voluminous, and in that sense is substantial, the quality of the evidence, for the reasons stated in our memorandum, is such that we cannot in good conscience, find and conclude that there is substantial evidence supporting the Secretary's Findings and Conclusions. Hence, our Order granting a Permanent Injunction.